IN

## NEW ORLEANS, JULY, 1845.

| 8r   573 |
| 120  437 |

PRESENT:

Hon. THOMAS C. NICHOLLS.
Hon. GEORGE ROGERS KING.
Hon. ISAAC JOHNSON.

## THE STATE v. MATHEW J. JONES.

The statute of 6th April, 1843, creating the Court of Errors and Appeals, authorizes an appeal on behalf of the State, from a judgment quashing an indictment for an assault with a dangerous weapon, and with intent to kill. Sec. 2.

The statute of 6th April, 1843, establishing the Court of Errors and Appeals, does not violate any provision of the constitution. It is not inconsistent with either the first or fourth sections of the fourth article of the constitution. The court established by the act of 1843, though a court of the last resort, is not a *Supreme Court* within the meaning of sec. 1, of art. 4 of that instrument. The term *supreme*, as used in that section, was intended to designate the independence of the court of any legislative control.

The stat. of 26th January, 1844, exempting the inhabitants of the parish of Rapides, residing on the west side of the river Calcasieu and bayou Sépa, from serving as jurors, cannot be considered as infringing the right secured by sect. 18 of art. 6 of the constitution to persons prosecuted in that parish by indictment or information, of having a trial by an impartial jury of the *vicinage*.

APPEAL from the District Court of Rapides, *King*, J.

*Preston*, Attorney General, for the State, appellant, in contending for the right of the State to appeal in this case, admitted that no appeal could be prosecuted by the State so as to affect a verdict of acquittal.

*O. N. Ogden*, for the prisoner. The State has no right to an

The State v. Jones.

appeal in a criminal case, none having been granted by the statute of 1843, creating the court. The act creating the court was unconstitutional. This court, having jurisdiction over the whole State, and in the last resort, cannot be considered an "inferior court," such as the Legislature has authority to create. The inferiority of a court must be determined by its powers and extent of jurisdiction.

NICHOLLS, J. The defendant, by his counsel, moves the court to dismiss this appeal, for this; "That there is no provision in the law establishing the Court of Errors for an appeal by the State; and such a right, as affecting the personal security and the liberty, and even the life, of a citizen, cannot be exercised unless it has been expressly or clearly granted."

The question embraced in this motion is of vital importance, and on its decision is involved a principle upon which the criminal jurisprudence of the State will mainly rest. It has been urged upon the court, with great weight of argument, that the circumstance of such right having, in no one of our sister States, ever been accorded to the commonwealth, shows conclusively the universal opinion entertained by their respective law makers, that public policy did not require such interpolation upon the principles consecrated by the common law of England; that the exercise of such a right would trench upon the liberty of the citizen, contravene the mild and just principle of the law securing him from a second trial for the same offence; abrogate the constitutional provision guarantying him a trial by jury; and, finally deny him that speedy trial which is secured to him by the same instrument.

The examination of these various questions furnishes matter of grave consideration, and the different aspects they present entitle them to the most solemn and serious investigation of the court, inasmuch as they do, at first blush, (we are ready to admit,) carry with them obstacles to the exercise of the right of appeal on the part of the State, not only formidable, but almost impossible to be removed. *Difficulties beset us on all sides.* On the one hand, the acknowledged truth of the absence of any statutory provision to that effect in most of our sister States; the novelty of the attempt now made, for the first time since the institution of this court, to appeal from the decision of the court, *a qua,* in favor of the accused; and last, not least, the general opinion of the bar, (so far as we have been enabled to ascertain it,) not only against the policy, but against the constitutionality of such a course of procedure. On the other hand; the plain unambiguous phraseology of the law, establishing this court, the unrestricted grant of the right of appeal in the act of 1843, the admitted *power* of the Legislature to pass all laws which it may

deem proper, subject only to the constitution of the United States, and to the constitution of the State of Louisiana. All these conflicting, complicated, discordant, but, at the same time, rational views and interpretations of the laws, which have given rise to the question at issue, admonish the court to approach its investigation with a proper sense not only of its importance, but of the intrinsic difficulty involved in the examination.

"An act to establish a Court of Errors and Appeals in criminal matters, and for other purposes," is the title of the act organizing this court. Having established the court and given it a name in the first section, the act proceeds, in the second section, to enact; "That this court shall have appellate jurisdiction, with power to review questions of law, which questions shall be presented by bills of exceptions taken to the opinions of the judge of the lower court, or by the assignment of errors apparent on the face of the record, taken and made in manner and form as now provided by law for appeals in civil cases." In this section is comprised all the power and authority with which the Legislature thought proper to clothe this court. The words, as already stated, are plain and unambiguous. The court is thereby vested with authority to review questions of law—all questions of law, with this restriction, that *the question be presented by bills of exceptions or by assignment of errors apparent upon the record, taken and made in manner and form as now provided by law for appeals in civil cases.* It follows then, if we confine ourselves to the requisitions of the statute, that if an appeal be taken upon a question of law, made to appear by bill of exceptions, or patent on the record, and in manner and form as now provided by law for appeals in civil cases, we are bound to entertain jurisdiction. This appeal is prosecuted before us under the second section of the act of 1843. It does present a question of law, under a bill of exceptions, and *is taken and made in manner and form as now provided by law for appeals in civil cases.* Are we at liberty to reject it, upon a fancied presumption that the Legislature did not intend to say what they have said, in language so plain, so unambiguous, so emphatic, that this court cannot mistake its meaning? Upon us it is imperative; it enjoins, it *orders* us to take jurisdiction, if the appeal be taken in the manner pointed out by the statute. By dismissing the appeal, this court would not declare, but make the law. Neither has this, or any other court, a right to make a distinction where the law has made none. *Ubi lex non distinguit, nec nos distinguere debemus.* The second section of the fourth article of the constitution enacts; "That the Supreme Court shall have appellate jurisdiction only, which jurisdiction shall extend to all civil cases, when the matter in dispute shall exceed the sum of three hundred dollars." In all

the various acts passed by the Legislature, granting appeals from the judgments of the courts created by them, no distinction is made between the plaintiff and defendant, intending the right to be reciprocal. The language invariably used is similar to that found in the constitution; such is the language organizing this court. Strike from the title of the act of 1843, the words, "in criminal matters," or rather substitute the words, "in civil matters," for those erased, then read the first and second sections of of the said act, and no one would have the hardihood to aver, that the right of appeal was not reciprocal—conferred by the act upon both plaintiff and defendant. No other interpretation can be given to the words used; they admit no other interpretation. Shall we (*in favorem vitæ* as is erroneously pretended,) assume the right to repeal an act passed by the Legislature, upon so vain and frivolous a pretext as this—veiling this arrogant assumption of authority by another assumption equally arrogant, and beyond our power, viz., that of altering the universally accepted meaning of words, by the learned and the unlearned? *One* or *both* of these acts *must* we do, before we declare that the second section of the act of 1843, contains words restricting the right of appeal to the *accused.* On the contrary, we find nothing in the act organizing this court, which confines the right to the accused, or which refuses it to the State.

Again, it is urged, that the concession of this right to the State would impinge upon and destroy the benignant and merciful provision of the common law, which secures the accused from the danger of being put in jeopardy twice for the same offence. This objection is more specious than solid. It is an illogical conclusion, a *non sequitur* from the premises. It by no means follows, because the State has a right to appeal, that the accused will be necessarily placed twice in jeopardy for the same offence. No better proof of the fallacy of this supposition could be required, than that which would be furnished by the record in this case, should the judgment of the inferior court be reversed. At the suggestion, and upon the motion of the party who originates the objection in this court, the indictment was quashed by the District Court, as having been found by an illegal grand jury, an indictment upon which (according to his own allegation,) no legal trial could be had. So far, then, from having been placed twice in jeopardy, the history of the case shows he has not been put in jeopardy at all. On the contrary, he has escaped scot free, without a trial. And thus would his own, and the crimes of all other offenders, committed within the confines of the Parish of Rapides, remain unpunished, and for no better reason than because the district attorney, either through ignorance or inadvertence, may have preferred a bad indictment, or because an indictment which

is good in law, (as is that on which these proceedings are based,) was by the court of the first instance considered bad, and quashed upon the motion of the accused.   To prefer a new indictment, in conformity with the erroneous opinion of the lower court, would be the only alternative left the prosecuting attorney, necessarily to be quashed in its turn by this court, upon appeal, and also upon the motion and suggestion of the accused, thereby defeating the ends of justice and insuring impunity to crime.   The speedy trial, (the deprivation thereof was caused by his own act and deed,) it is true, has been postponed and delayed from no act or fault of the district-attorney.   Add to this, that, if the argument is worth anything—if, by this appeal he be placed twice in jeopardy, the same result would follow, should the district attorney (acquiescing in the erroneous opinion of the court,) prefer a second indictment after the first had been quashed, for an alleged want of form.   Thus it would prove too much ; it would be a *felo de se*, and destroy itself.

Having a right to adopt the common law, either in whole or in part, (a right which will scarcely be questioned,) the Legislature might surely modify it to suit their own views of policy and consequently no want of authority could have been successfully urged, had this benign and merciful provision (as it is called,) been expressly excluded, whatever might have been said against its humanity or justice.   This point, however, it is not necessary now to examine ; but it is merely suggested for the purpose of showing that the fact of its forming part and parcel of the common law, constituted no estoppel to its exclusion by the Legislature, had such been their sovereign will and pleasure. When that question presents itself, it will be time enough to examine and decide it.

This record does not show a case where the accused has been placed either once or twice in jeopardy.

The novelty of this course of proceeding (an appeal on the part of the State,) exhibits nothing so repulsive as to cause this court to hesitate, if it appear eminently promotive of the ends of justice, and not incompatible with the stern requisitions of the law.   The glorious declaration of independence, the constitution of the United States, the whole fabric of our free and enlightened government, were novelties in their day—novelties entwined in every fibre of the American heart, life of its life, and blood of its blood, not to be severed but with the extinction of life itself.

In referring to principles consecrated by the common law, American courts should never forget, that that circumstance alone by no means justifies the indiscriminate adoption or recognition of them, under a system of laws presenting a modification only of the common law of England, and not the common law

The State v. Jones.

itself.   Blackstone eulogizes this law as *the perfection of reason*, establishing as an unerring test that what is not reason is not law ; admitting, however, as do all the English authorities, the legal axiom or apophthegm, *cessante ratione cessat et ipsa lex*.   Now, taking this admitted principle for our guide, (admitted alike by English and American jurists,) we should surely say, with the same independence which dictated the rule and sanctioned its application, that, whatever might be the principle recognized in England, if *the reason which required its recognition and appli*cation there, did not exist in the United States, the principle could find no place under our modified system of the common law.   Such would be the doctrine inculcated in England in a like contingency by the English judges—such should be the doctrine sanctioned by our courts and by our judges.

In England, in a capital case, no new trial is ever granted on the application of either the prisoner or the crown.   As a corollary, necessarily deducible from this state of the law *there*, the pleas *auterfoits acquit* and *auterfoits convict* must always prevail, when sustained by the record.   To be a bar under the *first* plea, the acquittal must be *by trial*, and by the verdict of a jury, on a *valid* indictment.   Hawk. b. 2, ch. 35, sec. 1.   4 Black. Com. 335.   On the second plea, (*auterfoits convict*,) it is averred, that he has been formerly tried and convicted ; and as a man once tried and acquitted for an offence is not again to be placed in jeopardy for the same cause, so, *a fortiori*, if he has suffered the penalty due to his offence, his conviction ought to be a bar to his second indictment for the same cause, *lest he should be punished twice for the same crime*.   2 Hawk. 251.   4 Co. 394.

It will be observed, that in England this plea *must* necessarily prevail, so long as that other principle is recognized as law, (*that no new trial can ever be granted in capital cases*,) otherwise the harmony of the whole body of the law would be destroyed, and the ends of justice totally defeated.   Instead of its being the perfection of reason, (as its eulogists proclaim it to be,) it would be the perfection of iniquity, despotic oppression and injustice. The adoption and recognition of the first principle, (*that no new trial can be awarded in capital cases*,) necessarily gave rise to the adoption and recognition of the second.   The first is the parent of the second ; it *could* not have been otherwise.   Once convicted, the fate of the accused was sealed ; the law afforded no means by which a reversal of the conviction could be effected ; there was no loop hole through which he could escape punishment. To have tried him a second time for the same offence, with this conviction suspended over him, existent, unreversed and irreversible, would have been too palpably absurd and iniquitous to have been tolerated in any stage of civilization.

Having established this rule in cases of conviction, even-handed justice required, that it should be meted out in the same manner, and for the same reason, in cases of *acquittal*, *both* absolutely and indispensably necessary in consequence of the rule, that no new trial should be awarded in capital cases.

A vast expenditure and waste of labor, and a great display of learning, is exhibited by Judge Story, (in 2 Sumner's Rep. 37, *et seq.*) in which the power to grant new trials in capital cases is denied. The name of this distinguished jurist is a host within itself; yet his pre-eminent abilities and recondite research have signally failed to make this court a convert to his opinion. *Nullius addictus jurare in verba magistri*, the conscientious judge should consult the law itself, and the reasons on which it is founded, as a less erring guide than the opinions of any legist, however learned and profound. In the case referred to, a new trial was refused, and the prisoners condemned to suffer a disgraceful and ignominious death, by virtue of a principle, which, (according to the admissions of Judge Story himself,) sanctioned and acknowledged by all the commentators, was incorporated into the law *in favorem vitæ*, and for the special benefit of the accused. In other words, these men were condemned to be hanged, and were, accordingly, executed, under an apprehension that, if a new trial were accorded them, this *humane* principle of the law would be violated. The invocation of such a principle was a mockery of justice. This new fangled pseudo-humanity could scarcely reconcile the prisoners to their fate, nor the learned and elaborate opinion of Judge Story, occupying twenty-six pages in Sumner's Reports, convince them of the justice, mercy, or humanity of the law. It would be in vain for the court to inform them, that, through the benignity of the law, and as a special favor to them, they must be hanged *now*, lest, by granting a new trial, the constitution of the United States might be violated, and their own precious lives be put in jeopardy *twice* for the same offence. The fallacy of this kind of reasoning consists, evidently, in attempting to adopt a principle, homogeneous to the common law of England, and absolutely and indispensably necessary to make it harmonize, and consistent with itself; but which, in the United States, under a different modification of the same law, would produce a result diametrically the reverse, abrogating its humane and equitable provisions, destroying its symmetry, and visiting upon its victims the penalty of death, for no other reason than because such would be the judgment of an English court, under the common law of England, not divested of that bloody feature which the humanity and good sense of the respective States of this Union, upon adopting the common law, have expunged from the system. Admit the doctrine, that, in

capital, as in all other cases, a new trial can be granted, and you restore the beauty and symmetry of the whole law; in which case, the fancied conflict with the provision contained in the constitution, of the United States, (which provision, it will be recollected, has reference to the courts of the United States, and not to the courts of the States,) is avoided and removed.

It is next urged, on the part of the prisoner, that the Legislature, in establishing this court, transcended its constitutional powers, which were limited, and confined to the creation of inferior courts; and our attention is drawn to the first and fourth sections of the fourth article of the constitution of Louisiana. By the first section it is provided, that the judiciary power shall be vested in a Supreme Court and inferior courts; by the fourth, that the Legislature is authorized to establish such *inferior* courts as may be convenient for the administration of justice. Hence it is contended, that there can be but one Supreme Court, (viz., that created by the constitution,) and that the Legislature is strictly confined to the creation (*eo nomine*) of inferior courts. Now this proposition is so incontestably true, that few can be found to controvert it; it is, in fact, a self-evident postulate, that the constitution, being the *suprema lex*, its injunctions are of stringent and binding force upon legislatures convoked by virtue of its authority, and existing solely under its sanction and control. It is equally clear and undeniable, that the courts to be erected must be *inferior* courts, otherwise they will want that constitutional sanction to breathe into them the principle of legal vitality. The investigation is thus narrowed down to the examination of the proper meaning to be attached to the word *inferior*, and to ascertain in what sense it was used by the framers of the constitution. We are asked in the argument of counsel, whether a court, to which is confided in the last resort, the question of life and death—a court by whose *fiat*, uncontrolled, and independent of all human supervision, the citizen may be deprived of his liberty, incarcerated for life in the gloomy walls of the penitentiary, and, to crown all, delivered over to the gibbet, and an ignominious death, can be called, in any sense of the term, an inferior court; or, if this be strictly and truly an *inferior* court, with what attributes would you clothe a court which would legitimately assume the title of *supreme* under the same code of laws. It is urged, that, in proportion as liberty and life are preferable to dollars and cents, is *that* court supreme (and not inferior,) to which is confided the preservation and protection of the first, over that whose mission is directed to the correction of errors in pecuniary matters, descending even to the paltry sum of three hundred dollars, the limited jurisdiction of the Supreme Court.

Were it obligatory upon this court to confine the range of its

investigation into the signification of the word *inferior* solely to the attributes of the courts, that is to say, to the greater or lesser dignity of the subject matter called in litigation before them, the argument of the accused would be irresistible, and the question at once decided ; but this court conceives that it is not so bound, and that the constitution did not attach so contracted a meaning to the term.    *Inferior*, it is true, is a relative term, presupposing a superior, its relations to which are indicated in the word itself ; but there can be no imaginable limit assigned to the kind, the nature, or extent of the superiority on the one hand, nor of the inferiority on the other, which are as multifarious, diversified, and capricious, as the fertile imagination of the person instituting the comparison may happen to select ; thus, the lion is superior to the horse in strength and courage, whilst the horse, in his turn, asserts and establishes his superiority in docility and fleetness.

We believe that the framers of the constitution used the term *supreme*, in the sense, that the court should be placed by the constitution beyond the control of the Legislature, not liable to be influenced or destroyed to suit the caprices, vacillations, and wonted mutations of the popular will—immutable and intangible by legislative enactment, and that they appropriately denominated it the *Supreme* Court.    We believe, that in using the term *inferior*, that word was selected with reference to the superiority as above explained, of the supreme, or constitutional court ; that sovereign and supreme, as was the source from whence the first court emanated, it was natural and proper that the constitution should have applied the epithet *inferior* to that class of courts which owed their existence to the Legislature, whose inferiority was apparent, as being themselves creatures of a higher power, to wit, of the constitution.    Deplorable indeed would be the administration of criminal justice in Louisiana if this reasoning be fallacious and unsound, or rather there could be no such thing as the administration of criminal justice at all.    No court being competent to take cognizance of crime—banished by its organic law from the portals of the Supreme Court, and the doors of all inferior courts hermetically closed against admission, criminal prosecutions would have found their death wound in the adoption of the constitution, and, incapable of revival during its existence, they must necessarily have remained in a state of suspended animation until resuscitated by the new constitution ; for the Supreme Court, true to the mandate of its creation, correctly repudiated all criminal jurisdiction, in the case of *Laverty* v. *Duplessis*, 3 Mart. 42.    Thus, it would necessarily result, that (if in defining the word *inferior*, we be restricted to the subject matter coming within their jurisdictions, respectively, *ratione*

*materiæ*, that court is superior to which is confided the life and liberty of the citizen; then all courts of criminal jurisdiction, *ex vi termini*, being *superior*, are obnoxious to the constitutional prohibition. A curious anomaly, *hiatus*, or *casus omissus* would be detected in our code of laws; a violation of a criminal statute could be visited by no punishment; in fact, the whole body of the criminal law would, by one fell swoop, be virtually repealed.

Having disposed of these preliminary questions, it remains to ascertain, whether the indictment was properly quashed in the District Court. The jury having been drawn in conformity to an act of the Legislature, passed the 26th January, 1844, the accused moved the court that the panel be quashed, *the jurors not having been drawn agreeably to the requirements of the constitution.* That act provides, that hereafter, the inhabitants residing on the western side of the river Calcasieu and bayou Sépa, shall be exempt from serving as jurors in said parish, any law to the contrary notwithstanding.

The violation complained of consists in having curtailed the territorial limits whence the jury should have been drawn, thereby depriving the accused of a trial by an *impartial jury of the vicinage*, guarantied to him by the 18th section of the 6th article of the constitution. This court is of opinion, that it never was contemplated that the then territorial divisions should remain for ever intact and inviolate, nor that the Legislature, in the organization of inferior courts, either as regards their territorial extent or subject matter of jurisdiction, was intended to be cramped by this provision in the constitution upon which the accused succeeded in quashing the indictment; that the Legislature had clearly the right to make the jurisdiction of the district courts embrace the whole extent of a county, or limit it (as they have done,) to the lesser circle of a parish; that that *jury* is an impartial one, which the Legislature declares impartial; and that that section of country whence the jury is ordered to be drawn for the court which is seized of jurisdiction over the offence, comprises the constitutional vicinage to which the party accused is entitled. It has never been doubted that the Legislature could prescribe the legal qualifications of jurors, elevating or depressing the standard as they thought proper. No good reason can be assigned why they may not exercise the same right as respects territory. An abuse of both powers is *possible*, though not to be supposed.

Wherefore, it is ordered, that the judgment of the District Court be set aside and annulled, that the indictment be reinstated on the docket, and that the District Court be ordered to proceed in the premises according to law, and agreeably to the principles laid down in the foregoing decision.

JOHNSON, J, in concurring with the opinion pronounced by Judge *Nicholls* on all other points, expressed his dissent from so much as recognized the right of the State to appeal.