ELIZABETH HUBGH *v.* NEW ORLEANS AND CARROLLTON RAILROAD COMPANY.

An action for damages caused by the homicide of a free human being cannot be maintained. A master is not liable to a servant for damages resulting from the negligence of another servant, unless that other servant was habitually careless or unskillful.

HUBGH
*v.*
N. O. & C. R. R.
COMPANY.

If the boiler of an engine of a railroad car has an apparent defect, and the engineer continues running it with a head of steam higher than he was instructed to carry, he could not recover damages for any injury he might sustain from the explosion of the boiler, nor can his widow or his heirs recover damages for his death under such circumstances.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. This cause was tried by a jury, who gave a verdict for the plaintiff for five thousand dollars. The defendants appealed.

*Ogden* and *Duncan*, for plaintiffs. *Benjamin* and *Micou*, for defendants.

The judgment of the court was pronounced by

ROST, J. The plaintiff alleges that her late husband, *Jacob Hubgh*, was employed, at a monthly salary, by the defendants to manage one of their locomotive steam engines, the boiler of which was, from age and great defects, unfit for use; that the said boiler exploded while her husband was in the discharge of his duty, killing him instantly ; and that the immediate cause of his death was the gross negligence of the defendants in failing to provide a safe boiler for the engine.

The plaintiff avers her destitute condition in consequence of the death of her husband, and claims $10,000 damages, to be equally divided between her and her children.

The defendants filed a peremptory exception, that the petition sets forth no cause of action, and, in case the exception was overruled, they answered by a general denial, and an averment that if there was any fault or negligence, it was that of the deceased and not theirs. The exception was overruled and the case tried before a jury, who found in favor of the plaintiff $5000 damages. The defendants have appealed.

The exception of the defendants presents the question, whether the death of a human being can be the ground of an action for damages.

On general principles, the only private rights which laws recognize, and which constitutions are established to protect, are the rights of persons and the rights of property. The plaintiff and her children, in this case, do not complain of wrongs to their own persons, and it cannot be pretended that they had any rights of property in their husband or father. It appears to us, therefore, that without a special statute authorizing such actions, they cannot be maintained. It is a strong argument in favor of this view of the law, that in a country where private rights are so well protected as they are in England, it is settled that those actions do not exist at common law. *Baker* v. *Bolton et al.*, 1 Campbell, 493.

In 1st Cushing's Mass. Rep. p. 475, a case similar to the present, the rule of the common law was re-affirmed ; and the judge being of opinion that if the facts stated were proved, they would not entitle the plaintiff to recover: a verdict was entered in favor of the defendants. In England, of late years, this omission has been supplied by statute in a limited class of cases. 9 and 10 Victoria, c. 93.

It is urged that, under the civil law, the present action can be maintained. But the plaintiff's counsel have not favored us with any authority from the Roman or Spanish law sustaining the position they assume. On the contrary, it is a general rule under those systems, that actions for personal injuries are strictly personal. 24 Pothier Pandectes, p. 279, law 13. 7 Partida, tit. 15, l. 3.

It is further urged, that under art. 2294 of our Code, every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it; that this article has enlarged the remedies given by the former laws in cases of damages arising from *torts*, and that the present action should be maintained under it. It cannot be denied, that the commentators of the same

article in the Napoleon Code seem to favor that opinion, and that the Court of Cassation has adopted it in two instances. Great as our deference is for that enlightened tribunal, we are unable to adopt their conclusions. The dispositions of art. 2294 are found in the Roman and Spanish laws; so far from being new legislation, that article embodies a general principle as old as the science of jurisprudence itself, and it must still be understood, with the limitations affixed to it by the jurisprudence of Rome and Spain. Domat Lois Civiles, tit. *Domages causés par des fautes*, p. 180, parag. 1.

But if the action could be maintained, there are other grounds upon which the plaintiff cannot recover.

Conceding that the deceased was not entrusted with the repairing of the boiler, and that this care devolved upon the engineer of the corporation, some of the witnesses have testified that the defects of the boiler were such as to be plainly visible on the outside. If so, the deceased could not be ignorant of the existence of those defects. Notwithstanding this knowledge, he continued to run the engine; keeping the steam, as is shown, much higher than he was instructed to do, or than would have been safe even with a sound boiler. After thus wantonly risking his own life and those of the passengers in the train, it is clear that he could not recover damages himself, if he was alive, for any bodily injury sustained by the explosion. The doctrine of the Court of Cassation, in the case cited from Sirey, that although the man who was killed in a duel could not, if he had only been wounded, have recovered damages for the injury, because he had exposed himself to the risk by which he was disabled, his widow could recover damages after he had been killed, will not bear the test of examination. In a pecuniary point of view, a wound, which would have rendered the deceased in this case a charge to his family during his whole life, would have inflicted on them a greater injury than his death. The decision relied on was undoubtedly made to discourage duelling. In that sense it may have been a good action, but, we are compelled to say, that it was a bad judgment. 27 Sirey, p. 529.

If, on the other hand, the defects which rendered the boiler unsafe were not visible, and we believe they were not, there is another ground still more conclusive. The deceased was a servant of the corporation, and had charge of one of the locomotives. The engineer, another servant of the corporation, had charge of keeping the locomotives and their boilers in a proper state of repair. As a general rule, a master is not liable to one servant for damages resulting from the negligence of another. In order to make the master liable in such a case, it is necessary to prove that the persons selected by him were habitually careless or unskillful. *Priestley v. Fowler*, 3 M. and W. 1.

The deceased and the engineer were engaged in a common service, the duties of which imposed certain risks on each of them; and in case of negligence on the part of the engineer, the deceased knew that that negligence was that of his fellow-servant and not of the defendants. He knew, when he engaged in their service, that he was exposed to the risk of injury, not only from his own want of skill or care, but also from the want of it on the part of his fellow-servant; and he must be supposed to have contracted on the terms that, as between himself and the defendants, he would run that risk. It is this implied agreement which excludes this case from the operation of art. 2499, C. C.

The principle is, that a servant when he engages to serve a master, undertakes, as between him and his master, to run all the ordinary risks of the service; and this includes the risk of negligence on the part of a fellow-servant, wherever he

is acting in discharge of his duty, as servant of him who is the common master of both.

Such is the language of the court in the late case of *Hutchinson* v. *The York, Newcastle and Berwick Railway Company;* and there can be no doubt that the rule therein laid down is in strict accordance with legal principles. See also the case of *Wigmore* v. *Jay,* Law Reporter.

It is not pretended that the engineer of the corporation was unskillful or habitually negligent; but it clearly results from the evidence, that the deceased was himself guilty of negligence in continuing to run the engine, if, as alleged, the defects of the boiler were visible.

It is therefore ordered, that the judgment in this case be reversed, and that there be judgment in favor of the defendants, with costs in both courts.

---

## SAME CASE—ON A RE-HEARING.

OGDEN and DUNCAN made the following argument in favor of a re-hearing of the case: The counsel for plaintiff respectfully ask the attention of the court to the following additional arguments, in support of their application for a re-hearing. The court lays down at the commencement of its opinion, an abstract proposition, that "on general principles, the only private rights which laws recognize and which constitutions are established to protect, are the rights of persons, and the rights of property," Applying it, the court proceeds to say, "the plaintiff and her children in this case do not complain of wrongs to their own persons, and it cannot be pretended that they had any rights of property in their husband or father." If there is no error in these premises, the conclusion of the court, that "without a special statute authorizing such actions, they cannot be maintained," would seem to be logical. But we respectfully ask the court, is there not error in this second proposition? It is true, that they do not complain of any corporeal injury, and in that sense they do not complain "of any wrongs done to their own persons." But personal injuries for which the law gives redress are not confined to those inflicted on one's own person. An action may be maintained by a husband for injuries to his child; a master, for injuries to his servant. It will not be denied that an heir may maintain an action for his own personal injury against the slanderer of his deceased ancestor; nor that in England and the United States criminal prosecutions are maintained for libels on the dead. And yet " in all cases the crime includes an injury; every public offence is also a private wrong and somewhat more; it affects the individual, and it likewise affects the community." 4 Black. p. 6. A libel on the dead is prosecuted because it is an injury and wrong to the living relations, and tends to a breach of the peace.

The present action is founded upon the direct injury to the plaintiffs themselves, and is not claimed as a right transmitted to them through the deceased. It is not therefore at all in conflict with the rules of the Roman or Spanish law, as stated by the court in this opinion, that actions for personal injuries are strictly personal. They claim their action on the very ground on which it has been given in France. By the common law and by the law of Louisiana, the husband owes support to his wife, the father owes support to his children. By our law, the wife is his partner in community; she has an absolute vested right in this community during its continuance, and to one-half of all its profits on its dissolution. Now it appears immaterial whether it can be said in strict propriety that she and her children have a property in him, because they have clearly a property in the support he is bound by law to provide them, and the wife has clearly a property in his future acquisitions and in his labor; and these rights of property are violated, and they are directly injured, when he is unlawfully killed.

The Code, in its treatise of the different modifications of property, recognizes rights as property. "Incorporeal things are such as are not manifest to the senses, and which are conceived only by the understanding; such as the rights

of inheritance, services and obligations," art. 451; and incorporeal things consisting only in a right, are classed as movables or immovables, according to the objects to which they relate, arts. 462, 463. Incorporeal things may be sold, art. 2424; a mere hope is property and may be sold, as the haul of a net, art. 2426. We therefore most respectfully submit that your honors, in the application to the plaintiff's case of the general proposition as to private rights, have restricted it too much, and that she does present to you in this record a case both of personal injury to herself and children, and of injury to her rights of property, which entitles her in point of law to judicial relief; and we also most respectfully submit, that if your premises are correct, a special statute merely giving the remedy, or in your language, "authorizing such actions," would not meet the case: because actions are only provided to enforce legal rights; and if it be true that the only private rights the law recognizes and protects are the rights of persons and the rights of property, and if it be also true that the killing of a husband or father is not a violation of either rights of persons or rights of property, as to the widow and children, then it would seem that the special statute must introduce a new principle, give a new civil right, as well as provide a new remedy. The opinion, before entering upon the reasoning, states the question presented by defendants' peremptory exception, that "the petition sets forth no cause of action;" and it states it in these words, "the exception of the defendants presents the question, whether the death of a human being can be the ground of an action of damages;" and this question, your opinion, if adhered to, would solve in the negative. Such an opinion will certainly require much limitation. We have in Louisiana a class of persons who, by our laws, as well as by those of many of our sister States, are regarded as property. Whatever may be the diversity of sentiment in respect to their character as property, they are certainly human beings. Are your honors prepared to say that the owner of a slave cannot, in Louisiana, maintain an action of damages against one who criminally or by negligence should kill his slave or his indented servant, on the broad ground laid down in this opinion, that the death of a human being affords no ground for an action of damages. We respectfully suggest that this question was not necessarily presented by the exception. The cases from Cushing and Campbell were not cited in argument, in either court, and we may therefore be indulged in a full examination of them now, as an opportunity to do so was not afforded on the trial. The case from Cushing, 1 Mass., p. 475, requires but little comment; the opinion says, that in it the "rule of the common law was affirmed." The rule of the common law as understood by that court, and as stated in the case from Campbell, was certainly adopted as its guide; but their adoption added nothing to the force of the rule, nor decided authoritatively what the rule was.

If, indeed, this decision in Cushing's Mass. R., vol. 1, p. 475, is to be relied on as authority, we must claim it as favorable to us; not only in saying as it does that this action could be maintained by the Spanish law, the Scotch law and the civil law, but also because it cites, with apparent approbation, a New York case, in which a father was permitted to recover damages for the killing of his son, "a human being," although the measure of damages was restricted to the interest of the father in the services of the son up to the time of his majority. We ask your honors whether this was not a distinct recognition of the principle, that an action would lie for the death of a human being, although the measure of damages might depend upon the circumstances peculiar to the case.

The case from Campbell, *Baker* v. *Bolton*, 1st, 499, was this: The plaintiff stated a case of injury to his wife and himself, resulting in her death; Lord Ellenborough instructed the jury that they must confine their consideration to injuries to plaintiff and to his wife up to the moment of her death, and added that the "death of a human being could not in a civil court be complained of as an injury." To understand this, it is necessary to refer briefly to the history of this subject in the common law of England. If your honors will recur to it, we submit with the utmost respect that notwithstanding this decision, the only one that has been found, the common law does not bear you out. It has given, from time beyond the memory of man, a legal remedy for the very injury complained of in this case.

This remedy was the appeal. This appeal we are told by Blackstone, 4th vol., 383, "was an accusation by a private subject against another for some heinous crime, demanding punishment on account of the particular injury suffered rather than for the offence against the public. It had its origin in those times when a private pecuniary satisfaction called a *weregild*, was constantly paid to the party injured, or his relations, to expiate enormous offences." He then

traces this custom to the ancient Germans, and shows that in the same manner by the Irish Breton law, in case of murder, "the Breton or Judge was used to compound between the murderer and the friends of the deceased who prosecuted him, by causing the malefactor to give unto them, or to the child or wife of him that was slain, a recompense." Blackstone further states that "the only crime against one's relation for which an appeal may be brought, is that of killing him by either manslaughter or murder." But this cannot be brought by every relation, but only by the wife for the death of her husband, or by the heir male for the death of his ancestor. "It is given to the wife on account of the loss of her husband; therefore, if she marries again, before or pending her appeal, it is lost and gone; or if she marries after judgment, she shall not demand execution.

So much was the private right respected in these early periods of the common law, that it took precedence of the public prosecution. "These appeals may be brought previous to any indictment, and if the appellee be acquitted thereon, he cannot be afterwards indicted for the same offence." 2 Black., 314. "In like manner," he adds, "as by the old Gothic Constitution, if any offender gained a verdict in his favor when prosecuted by the party injured, he was also to be acquitted of any crown prosecution for the same offence; but, on the contrary, if he made his peace with the king, still he might be prosecuted at the suit of the party." Again, this author tells us "if the appellee be found guilty, he shall suffer the same punishment as if he had been convicted by indictment, but with this remarkable difference, that on an indictment, which is at the suit of the king, the king may pardon and remit the execution; on an appeal, which is at the suit of a private subject, to make an atonement for the private wrong, the king can no more pardon than he can remit the damages recovered on an action of battery." In like manner as when the *weregild* continued to be paid as a fine for homicide, it could not be remitted by the king's authority. "However," he adds, "the punishment of the offender may be remitted and discharged by the concurrence of all parties interested, and as the king by his pardon may frustrate an indictment, so the appellant by his release may discharge an appeal. *Nam quilibet potest renunciare jure pro sc introducto.*" 4 Black., p. 316.

The same author informs us, that "by virtue of the statute of Westm. 2d, 13 Edward I, c. 12, if the appellee be acquitted, the appellor shall suffer one year's imprisonment, and pay a fine to the king, besides restitution of damages to the party for the imprisonment and infamy which he has sustained; and if the appellor be incapable to make restitution, his abettors shall do it for him, and also be liable to imprisonment." This, as foretold by the author of Fleta, proved a great discouragement to appeals, so that from thenceforward they ceased to be in common use. 4 Black., 316. In a note of Christian, same page, Ed. 1800, we find references to distinguished common law reports: "Some appeals of late years have been commenced, but not prosecuted with effect." 5 Burr, 2643. "They have probably been compromised, as the chief object of an appeal, in all times, was to compel the defendant to make a pecuniary compensation. For where the verdict in an appeal was given in favor of the appellant, he might insist upon what terms he pleased, as the ransom of defendant's life or a commutation of the sentence. In an appeal in which the defendant was found guilty of manslaughter, it was doubted whether the king could pardon the burning in the hand, and the defendant compounded with the appellant for 40 marks." 3 P. Wms., 453.

The clause of Magna Charta, taking away the appeal from all women except the wife for the death of her husband, and its being given to the innocent wife rather than to the heir, are proofs that the common law regarded it as an injury personal to the wife, for which redress in damages ought to be granted, and it was given though in the form of a criminal prosecution. The case from Campbell was decided in the year 1800, and while the action of appeal was in force. It was also a maxim of the common law, that the trespass was merged in the felony. "No trespass lies because it appears to the court to be felony, for this appertains to the king only to punish." "An action of trespass does not lie for the baron for battery of the *feme*, by which the *feme* languished for six weeks and then died of the stroke; for this is felony." Viner's Abridgment, 20th vol. p. 473. The reasons for this are found at large in the books of the common law: "The public mischief is the principal concern. The private wrong is swallowed up in the public," and in case of felony, "as the public crime is not otherwise avenged than by forfeiture of life and property, it is impossible afterwards to make any reparation for the private wrong." That this is confined to felony,

from motives of public policy in England, is shown by the fact that the action for damages for the private wrong is allowed in all cases below felony ; as for battery, nuisance, libel, &c. Hence, it was very natural that Lord Ellenborough should say, as he did in the case from Campbell, that " in a civil court," the death of a human being could not be complained of as an injury. · The remedy being a criminal prosecution either by indictment at the suit of the king, or by an appeal at the suit of the party interested.

And what is the conclusion from all this, so far as the common law of England is concerned ? why, that the killing of a human being was always regarded as a direct injury to his family, for which they were entitled to compensation in damages, and for which they had an action, and that although, from motives of policy and convenience, and from maxims peculiar to the common law, an action on the case for trespass could not lie in a civil court, yet a far more stringent remedy, having for its object a civil compensation in damages, was allowed in the appeal; and that this remedy for this injury continued to be the law of the land in England, until it was abrogated by act of Parliament, in the year 59 of the reign of George III, within the present century. And in still further proof that by the common understanding in England, this is regarded as a private injury, a violation of a right protected by law, we cite the statute of 9 and 10 Vict. c. 93, which provides that " in the case of the death of a person by any wrongful neglect or default of another, the person who would have been liable to an action of damages if death had not ensued, shall be liable, notwithstanding the death of the person injured shall have been caused under such circumstances as amount in law to felony ; the damages to lie for the benefit of the wife, husband, parent and child of the person injured. And in such case, the jury may give such damages as they may think proportioned to the injury resulting from such death to the parties respectively, for whose use such action shall be brought." This statute sufficiently shows on its face why it was enacted. It does not profess to give a new cause of action, a new civil right. But it tacitly admits the existence of a right for which under the artificial rules of the common law there is no remedy ; and it provides the remedy, by declaring that although the act be felony in law, the private wrong shall not be merged in the crime, but that the wife or husband, parent or child, shall notwithstanding have a civil action for damages. It gives the very action which your honors find claimed in the record before you. The court, in Cushing, says, " The English statute gives damages as such, and proportioned ·to the injury to the husband or wife, parents and children of any person whose death is caused by the wrongful act, neglect or default of another person ; adopting, to this. extent, the principle upon which it has been attempted to support the present action." 1 Cush. 480.

It is very evident, therefore, that this court has adopted the practice and not the principles of the common law. Its principles favored the action—its practice refused it as a civil remedy. And now, when the action is allowed in England, as a civil remedy, under the remedial statute of Victoria, intended to conform the practice of the common law to its principles, and no longer to suffer the right to exist without a remedy, the highest court in Louisiana introduces here, on the authority of an English decision, (made fifty years ago,) a practice which an English parliament has abrogated, and which English courts no longer follow. In the common law States of this country, the statute of Victoria had of course no effect in modifying the practice, hence they followed the rules and practice of the common law until changed by statutes similar to that of Victoria ; which change has been made in several States.

Let us then enquire whether in Louisiana the same necessity to enact such a statute exists, and whether we have not now a statute which fully authorizes the action. The true question presented by the peremptory exception for the decision of the court, we apprehend to be this : does the killing of a husband or father, by *fault,* constitute a civil injury to the widow or children, such as to entitle them to sue for compensation in damages proportioned to the injury they sustain ? The common law regarded it as a civil injury, though it refused the civil remedy.

The statute of Victoria, and similar statutes in the common law States of this country, have regarded it as a civil injury, and amended the practice of the common law by granting the civil remedy. The common sense and feeling of mankind regard it as a civil injury, and recognize the claim for redress ; and surely no court of justice can look with complacency on a case of such injury, unredressed,

Hungh
v.
N. O. & C. R.R.
Company.

or be led to believe, but on the clearest demonstration, that it has no power to grant a remedy for such a wrong.

We had supposed that there were two or three articles of our Code, clear and explicit, which authorized this action. Article 2294 : " Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it." The following articles in the same chapter are developments of the same principle : 2295, " Every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence, or his want of skill." Article 2296, " We are responsible not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." 2299, " Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed ; the responsibility attaches only when the master or employers, &c., might have prevented the act which caused the damage and have not done it." The article 2294 is borrowed, word for word, from the article 1382 of the Napoleon Code. It is well known that under this article various actions for *torts* have been sanctioned in our jurisprudence, and among others, actions of slander. *Miller* v. *Holstein*, 16 L. R. 411.

But as there had been no instance here of its application to a case of homi cide, we naturally turned to the French jurisprudence, from which it had been taken, and urged upon the Court, that under this article, the action could be maintained. Your honors say, " It cannot be denied that the commentators of the same article in the Napoleon Code seem to favor that opinion ; and that the Court of Cassation has adopted it in two instances. Great as our deference is for that enlightened tribunal, we are unable to adopt their conclusions." We hope to be excused for expressing some surprise that your honors should seem to doubt that this is the well settled jurisprudence of France. The commenta- tors treat it as free of all doubt, and the instances in which it has been sanctioned by the Court of Cassation are numerous, although we did not deem it necessary to cite more than a few cases ; those cases being marked and unequivocal.

One was of murder, where the dying man had forgiven his murderer, and the court decided that this pardon could have no effect in depriving his family of their action for the direct injury and damage caused to them by his death ; and this on the ground that their action was not derived through him, but was per- sonal to them for their own loss and injury.

Another was the case of the duel ; when the court decided, that even admit- ting that the consent of the duellist to the chances of the combat, would have been a good defence to any claim of damages on his part for wounds, neverthe- less, if he is killed, such consent would not deprive his family of their action for damages, for their own direct injury caused by his death. And this opinion, your honors say, " will not bear the test of examination."

If it be true, that the action is given to the family on account of their own direct injury, and that the law regards the unlawful killing of a man as an act directly injurious to his family, and if it be also true, as it is beyond all question, that both the Roman and the French law held a party responsible for any act which was the result of his fault, rashness, or imprudence, however slight, where such act caused damage to another, then it would not seem absurd to apply these principles to a case where another concurred in the fault. If the husband or father had been killed justifiably, as in necessary self-defence, or to prevent a known felony, there was no fault in his slayer, and consequently no room for the application of the article.

Another case was cited from Toullier, 8th vol. page 56. It is to be found reported by Sirey, 19th vol. page 269. It was not a case of a duel, and is free from the censure which your honors cast upon that case, when you say " The decision was undoubtedly made to discourage duelling. In that sense it may have been considered a good action, but we are compelled to say a bad judg- ment." We use the term censure, because it would be a reproach to the high- est court in the French Republic to give through ignorance a false interpretation to the law, in a matter of the deepest moment to society ; and it would be a still greater reproach to such a tribunal, to give such an interpretation, advisedly, in such a case or in any case, twisting or distorting the law, to accomplish any object however laudable or desirable. *Jus dicere non jus dare*, is the province of the judge.

The case we refer to was this: *Rolland*, suspecting *Gosse*, his servant, of theft, accused him, and at night suffered *Berthoult* and *Mancel*, police officers, to enter his house to arrest him; and in the attempt to arrest him, *Gosse*, resisting, was killed by *Mancel*. *Berthoult* and *Mancel* were prosecuted criminally, as guilty, 1st, of voluntary homicide; 2d, of an arbitrary assault upon personal liberty. *Rolland* was also prosecuted as accessory; the widow of *Gosse* made herself a party to this criminal prosecution, and demanded damages against the principals, and also against *Rolland* for having assisted in the killing of her husband. The accused were acquitted, but condemned to pay the widow damages, on the ground that the death of *Gosse* was owing to their imprudent conduct. On appeal, the Court of Cassation corrected this decision, so far as it condemned *Rolland* to damages, for the death of *Gosse*, " *a raison de la mort de Gosse*," because from the indictment itself it appeared that he was in no wise connected with it, either as principal or accessory. The Court of Cassation remanded the case, and the widow then renewed her demand of damages against *Rolland*, on the ground that he had participated in the arbitrary conduct against the person of *Gosse*; " *Sur ce que Rolland, avait participé, à l'acte arbitraire exercé sur la personne de Gosse*."

*Rolland* pleaded *res judicata*: that as the court had decided that he was neither principal nor accessory in the illegal arrest, *ni auteur ni complice*, it would be to draw a second time into question a point adjudged. This plea was sustained by the lower court; but on appeal, the Court of Caen reformed the judgment and gave the widow 6000 livres damages, on the following grounds: that although the jury had decided that the facts did not constitute the crime or *delit* complained of, nevertheless the civil court had the right to examine the same facts in regard to the injury they may have caused to third persons, and that *Rolland* in opening his door after night to the police officers, who had no right to enter without his consent, had committed a *quasi* offence, *quasi delit*, which created against him the obligation to repair the injury resulting from it, according to the terms of the arts, 1382 and 1383 of the Civil Code. *Rolland* having appealed from the decision, it was affirmed by the Court of Cassation, on the 5th of November, 1818. In affirming this decision, the Court of Cassation declares that the acquittal on the public prosecution does not protect the accused from an action of damages in a civil suit; and that in such suit, the civil tribunals have the right to examine the same facts and circumstances, and to find in them a *quasi* offence, and to award to the injured party the damages he may have sustained, and that this action for damages is fully sustained by the art. 1382 of the French Code, from which the art. 2294 is taken.

. We referred the court to the deliberations of the jurists assembled by Napoleon, where this article was under discussion, to show that they designed it to have its application in every case of wrong and injury. *Locré*, vol. 13, p. 8.

They were not called on to create a new system of jurisprudence, but to reduce to method and simplicity one already existing, with such improvements as experience might suggest.

The ancient jurisprudence of France had always allowed this action of civil reparation to the widow and children for the direct injury they suffered by the killing of the husband or father. We beg leave to quote a few instances of this from Merlin's Rep. v. 28, tit. Reparation Civile:

"In 1690, *Lebrum* was found guilty of the murder of *Madame Mazel*, and sentenced to pay to her sons 800 livres, as civil reparation in damages. In the same year his innocence was discovered, and *Gerlac*, the real murderer, was convicted and condemned to pay 8000 livres as damages to the sons of *Madame Mazel*. Merlin Rep. v. 28, p. 420.

The Parliament of Paris decided, 28th Feb., 1681, that the civil reparation was to be paid out of the property of the convict in preference to the fine adjudged to the State. This was in the case of the wife of *Desclaircius*, convicted of the murder of her husband. The mother of *Desclaircius* had recovered judgment for damages; a contest arose between her and the farmer of the revenue, who claimed preference for the fine. Merlin's Rep. vol. 28, p. 442. *Recueil de Denizart*. The same court had, in 1660, decided the same thing. *Ibid*. It is to be paid even in preference to the dowry of the wife. It was so decided in 1581: a man, after killing his wife, married another. The father of the murdered wife prosecuted his son-in-law, and had him condemned to death and to 6000 livres of damages to him. The second wife claimed a preference over the father, for her dowry. But the decision was against her; the 6000 livres were

ordered to be paid entire to the father of the first wife, and the surplus of the property of the convict was declared affected and mortgaged to the dowry of the second wife. Merlin's Rep., vol. 28, p. 444.

In the same vol., p. 445, we find a decision of the Parliament of Paris of 3d April, 1685, on the following case : *Denis Provost* of Troges, was assassinated in 1669, and his widow sued for 20,000 livres as damages ; afterwards, in the same year, a criminal prosecution having been instituted, she stated to the court, that in order not to retard the decision in the prosecution she would desist for the present from her demand for civil reparation. The accused was executed ; and the same sentence which condemned him adjudged the postponement of the civil suit. The widow made no subsequent demand, but having re-married with *Riaultz*, he, in 1680, obtained a commission, and cited before the Parliament the brother of the accused, who had himself been condemned to banishment in the same prosecution, and had since obtained a reversal of his sentence. This brother pleaded as a peremptory exception, the criminal sentence, on the maxim *non bis in idem*. On full consideration of the case, the decision recognized the clear distinction between the public prosecution for crime, and the private action for civil redress, rejected the plea in bar and condemned him to 3000 livres of damages : one-third to the widow and two-thirds to the minor children of *Denis*. Merlin says that the decision is contrary to the doctrine of Papose, who says, "after judgment, the injured party ought not to be allowed a civil action against the accused on the facts criminally decided." And Merlin adds : "Imbut is of the same opinion in his work on Criminal Practice, 'when the injured party.' he says, 'wishes to assert his civil rights, he must do so before sentence ; if he does not, he is no longer to be allowed to demand damages, because,' he adds, ' it is a thing terminated and finished.' "

These learned opinions, it will be observed, differ only in regard to certain incidents of the action, but agree as to the action itself, and the right on which it is founded. In the same vol., p. 446, we see how these civil damages were divided among the injured parties. The silence of the general laws, and of most of the customs, had left this subject in much uncertainty. Two decisions, 1666 and 1685, gave one-third to the widow and two-thirds to the children. In the dictionary of Brillon there is found a decision of the 1st of June, 1554, rendered between the widow and children, which orders that one-half of the reparation in damages for the murder of the husband shall be given to the widow, and the other half be secured to the children. This half, Merlin says, is adjudged to the widow in most of the provinces. "The art. 16 of tit. 12 of the Custom of Cambray, provides, that the funds proceeding from the civil reparation for the homicide ( in the original, "*paix de l'homicide*,") are not subject to pay the debts of the person killed, but belong one-half to the widow and the other half to the nearest heirs of the person killed, if he was married ; otherwise, all belonged to his nearest heirs. By the terms *paix de l'homicide*, the custom means the compromise made with him who had committed it." Merlin adds, " the other customs which make mention of this reparation always accord it first to the widow, because, says Lebrum, her affliction does not yield or ought not yield to that of any other person who has an interest in prosecuting the just punishment for the death of the deceased." A decision of the Parliament of Toulouse, 1614, one of that of Bretagne, 1614, others of Leble Hainaut, earlier, adjudged the half of this reparation to the widow, and the other half to the heirs.

A decision in 1664 permitted a wife, who had re-married, to succeed on the death, *ab intestato*, of tw oof her children by the first marriage, to their portion of this reparation. The wife was permitted to participate in this civil reparation, whether she was common in goods or not. She could renounce the community, without losing this right ; it was the same as to the relatives of the deceased. The wife, in claiming it, did not render herself liable as partner in community, nor did the relations render themselves liable as heirs.

Ricard, on the art. 237 of the Custom of Paris, expresses himself in these terms : " It is, accordingly, a well known maxim of our law, that the wife who renounces the community does not lose the right to receive the damages which may be accorded to her for the killing of her husband, without any liability for debts." " If a child, who had prosecuted the murderer of his father, obtained damages, he was not bound to divide them with his co-heirs ; this reparation was due to his loss, to his filial affection, and not to his quality of heir." *Ibid.* 447.

The Court of Cassation, in maintaining this action under the art. 1382 of the French Code, doubtless construed that article by the lights afforded by the ancient jurisprudence of France, as well as by the declared intentions of its framers, and its own obvious sense. Louisiana was a province of France, and its first inhabitants brought with them the laws and usages of France. When, in 1808, the Legislative Council of Louisiana adopted the Civil Code, they borrowed many provisions from the Napoleon Code, and the article 1382 was adopted, word for word. In 1824, when Louisiana remodelled her code, the Legislature took as its guide the Napoleon Code, and continued to adopt this article, without change or restriction. The jurisprudence of France, both before and since the Napoleon Code, and the commentaries of French jurists on this art. 1382, were before them; and if they had intended to give it a more restricted application than it had received in France, they would have declared such intention. They well knew that our courts were in the daily habit of consulting the opinions of great French jurists, and the decisions of the Supreme Court of France, to aid them in solving difficult questions of law; as in the common law States, courts look to England, the fountain of their jurisprudence. Our Legislature could not have declared that this article should be construed with reference to the Roman, Spanish or common law, without violating the 11th section of the 4th art. of the Constitution of 1812, prohibiting the introduction of a system of laws by a general reference, and requiring that every provision enacted shall be specified; a prohibition in accordance with the principle, that those laws are best which leave least to the discretion of the magistrate; and proceeding from a just fear that judges, however pure and enlightened, might, if obliged or permitted to search in foreign codes for rules and precedents, be sometimes unconsciously led into errors fatal to the administration of justice. The Legislature could have said the articles should not embrace a case of homicide; and it was necessary to say so, if such was their meaning, because the terms of the article embrace such a case; and it may be said, that on so important a subject they would not copy an article literally from the French Code, without restriction, unless they designed it to receive the same construction here as it was then known to receive in France.

The opinion says: "It is urged, that under the civil law, the present action can be maintained. But the plaintiff's counsel have not favored us with any authority from the Roman or Spanish law, sustaining the position they assume. On the contrary, it is a general rule under those systems, that actions for personal injuries are strictly personal." 24 Pothier, Pandects, p. 279, law 13. 7 Partida, tit. 15, law 3.

It is with great reluctance that we have to crave the pardon of the court for saying, that we have been misapprehended ; that we did not "assume the position," and "urge it," that under the civil law the present action can be maintained. An axiom of the common law, *actio personalis moritur cum persona*, was relied upon by the defence ; and we contended, that it was not a principle of the law of Louisiana. We quoted the articles 31 and 32 of our Code of Practice, which defined personal actions as arising from crimes and offences, and *quasi* offences, as well as from contracts and *quasi* contracts ; and the article 25, which shows clearly that such actions may be brought against the person. We also contended, that it was not, in its full extent, a principle of the laws of Rome or of Spain, and quoted Domat of Hs. and ex. in qui, 81, tit. 1, sec. 10, vol. 1, p. 579, and Partida 7, law 3, tit. 15. We still respectfully invite scrutiny to these references. We did not furnish the court with authorities from the Roman or Spanish laws in support of this action, because by the act of our Legislature of the 25th of March, 1828, all rules of proceeding which existed prior to the Code of Practice, and all the civil laws which were in force in this State prior to the Civil Code of 1824, except as part of the Old Code, which treated of corporations, were abrogated. Acts of 1828, p. 160.

After this, although these laws might be appealed to, as written reason, for principles, they could not be consulted as authority in questions of practice. It was unnecessary to refer to these laws for principles, as our own laws had amply provided that an obligation, the *vinculum juris* of the Roman law, was created as well by a crime, offence or *quasi* offence, as by a contract or *quasi* contract, and equally gave rise to a personal action.

Your honors have, in a recent case, declared that it was equally the boast of our law and of the English law, that there is no right without a remedy, and no wrong without adequate redress. If then, under this article (2294) no action

can be allowed in this case, it can only be because the act complained of cannot cause damage or wrong and injury to the widow and children, and is, as to them, *damnum absque injuria*—a conclusion which this honorable court would not adopt. Is there, then, any impediment to this action arising from any peculiar dogmas or principles of our law, as it was shown was the case in England before the statute of Victoria? None has been intimated in the opinion from the bench; and none, we confidently maintain, does exist.

The importance and novelty of this question naturally led your honors to pro-ceed with great hesitation; and in the midst of the pressure of business, it is not strange that the respectable authorities from Cushing and Campbell should have commanded great weight. The law has wisely considered, however, that the highest courts may err; and by affording them a mode of revising their own decisions, through a re-hearing, has manifested its confidence in their ability to do that which is far more difficult than to decide right—admit and correct an error; an effort which implies intellectual superiority, as well as moral dignity. Lord Chief Justice Pratt, in answer to an objection of novelty, said, "*torts* are infinitely various: there is nothing in nature which may not be an instrument of mischief; and the special action on the case was introduced, because the law will not suffer an injury without affording a remedy, and there must be new facts in every special action on the case."

Justice Ashhurst said: "That when a case was only new in instance, and the only question is on the application of a principle recognized by law to such a new case, it will be just as competent for courts of justice to apply the acknow-ledged principle to any case which may arise two centuries hence, as it was two centuries ago."

It being evidently impossible in any code to provide specific rules for every case, our code, art. 21, provides, that "in civil matters, where there is no express law, the judge is bound to proceed and decide according to equity." No suitor, then, need go unredressed. "To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent." The concurrence of mankind in different ages and countries is regarded as the highest evidence of what is natural law and reason. There has been such general con-currence in regard to the right of relations to claim damages for homicide, in all nations and ages of which we have records. Homer emblazoned it on the shield of Achilles.

The opinion, however, says, that "if the action could be maintained, there are other grounds on which the plaintiff cannot recover. Conceding that the deceased was not entrusted with the repairing of the boiler, and that this care devolved upon the engineer of the corporation, some of the witnesses have testi-fied that the defects of the boiler were such as to be plainly visible on the outside. If so, the deceased could not be ignorant of those defects. Notwithstanding this knowledge, he continued to run the engine, keeping the steam, as is shown, much higher than he was instructed to do, or than would have been safe even with a sound boiler. After thus wantonly risking his own life and those of the passengers in the train, it is clear that he could not recover damages himself, if he was alive, for any bodily injury sustained by the explosion." &c.

And in the conclusion of your decree, your honors say: "It clearly results from the evidence, that the deceased was himself guilty of negligence in con-tinuing to run the engine, if, as alleged, the defects of the boiler were visible." In this statement, we are prepared to show conclusively, there is great error of fact. We presume the attention of the court was so much engrossed with the important legal question as to the right of action, that your honors did not con-sider so carefully the minor questions in the cause; especially as it was scarcely necessary to do so, after deciding that the action could not be maintained. It will be noticed, that the opinion does not say, it is proved "that the defects of the boiler were visible. The language is peculiar: "some of the witnesses have testified." And again, the opinion does not say, it was proved that the deceased was guilty of the supposed negligence, but that he was so guilty, "if, as alleged, the defects of the boiler were visible." Now, it is shown by this very statement, that this question of negligence was an issue submitted to the jury, on which evidence was taken; the verdict negatived the charge of negligence, and on motion for new trial, was supported by the judge who tried the cause and heard the witnesses. It would be contrary to the uniform practice of this court to set aside this verdict and judgment, unless clearly shown to be contrary to the evi-dence. In this case it is set aside, not because the evidence proved the neglect,

but because some of the witnesses testified that the defects were visible; and "if such was the fact, there was neglect." Yet, your honors say, that you do not believe that such was the fact. "If, on the other hand, the defects which rendered the boiler unsafe were not visible, and we believe they were not, there is another ground." &c.

An argument of negligence cannot be built upon an hypothesis which your honors admit is untrue. And how stands the proof? for your belief rests upon the proof. It is this: the boiler is encased in a wooden frame of staves and bands; the iron is not exposed to the light, and is never seen except when stripped of this sheathing. Only two witnesses speak of seeing the defects of this boiler on the outer surface of the iron. *Kohn*, the workman who repaired it for the company, in the workshop, three years ago. It was then stripped for repairs. But it is not shown that any one there saw those defects but *Kohn*. The engineer in chief of the company and the foreman of the shop swear they did not see them, and knew nothing of them. The deceased was not then in the employ of the company, but was absent, and in other employ at a distance. On only one other occasion is it shown to have been stripped, and this was by the explosion, when the defects were seen by the other witness, *Pitfield*. The deceased was then dead. The testimony, then, only went to show that these defects were on the outer surface of the iron boiler, but could not be seen when the boiler was encased. And it was fully proved, that it was no part of the business of the deceased to examine or repair the boiler; and there is not a scintilla of proof that he ever saw the boiler out of its case, or had the slightest knowledge of any defect. We most respectfully ask, is there not an error in considering this a ground on which to deprive a widow and children of a solemn verdict and judgment, rendered on full consideration of the evidence, in such a case as this?

We now pray your honors to reëxamine carefully the last ground, which, briefly stated, is, that a master is not liable to a servant for damages resulting from the negligence of another servant, unless that other servant was habitually careless or unskillful; that the servant takes upon himself all the ordinary risks of the service, including the risk of negligence on the part of a fellow-servant. We do not deem it necessary to question the correctness of these legal principles. But we do most respectfully and earnestly request your honors to examine again, whether they are conclusive against us in this case. If your deliberations should lead you to conclude that the action can be maintained, and that the fate of this case must depend upon this last ground, you will feel the importance of giving it a careful re-consideration. In doing so, we beg you to bear in mind that the question of negligence, and all other questions of fact, were left to the jury; and that we have the advantage of their verdict; and that it has been the uniform practice of this court, when convinced that the finding of the jury on such a question was not supported by the evidence, to remand the cause for a new trial.

The petition charged, that the explosion was owing solely to the old age, long use, worn-out condition and defects of the boiler; and that the death of the deceased was occasioned by the neglect of the defendant in improperly continuing to use on their railroad a boiler insufficient, defective and unfit for use.

The defendant did not attempt to set up the special defence contained in the legal principles your honors advert to, by imputing this casualty to the negligence of a fellow-servant, nor attempt to prove any such carelessness. On the contrary, a defence was set up utterly inconsistent with it, to wit, that "the deceased was employed for the special purpose of attending, examining and superintending repairs of the locomotive and boiler; and if there was fault or negligence, it was that of the deceased, and not of the defendant."

This defence was proved, by the witnesses of defendant, utterly unfounded; and it was shown by them, that he was a mere subordinate, in a very humble capacity, at a small monthly salary, with no power to examine the condition of the boilers and locomotives, or to suggest repairs, but bound to use such as were furnished him; and that he was daily employed in driving them from an early hour in the morning until late at night. It is also fully proved by defendants' witnesses, that he was a faithful and competent locomotive driver, sober, industrious and attentive to his duties; that he never lost a day from sickness or any other cause; that he was in the prime of life, and had a family dependent on him; and that for his incessant service to the company, Sundays included, he received fifty-six dollars a month.

Now, what would the law imply in such a contract? Surely, that if he agrees, as laid down by your honors, "to run all the ordinary risks of the service," he shall not be exposed to extraordinary and excessive risks through the fault and neglect of his master. If, as is here proved, it is a part of his contract that he has nothing to do with the repairs of the boiler, but is bound to confide all that to a superior authority, surely the correlative engagement is, that his employers shall furnish him with safe and sound boilers, and shall omit no diligence incumbent on them, and commit no neglect which may increase his danger beyond the ordinary risks of the employment.

An illustration of the principle referred to by the court, as stated in a late case which we have not seen. is furnished by the facts contained in this record. The fireman and driver were both killed. If this boiler had been sound, and the explosion had been caused by the fault of the driver, it would, under this principle, have been a good defence for the company in an action by the widow or children of the fireman. And so, if this boiler had been sound, but by reason of some improper order of the engineer in chief, as to the amount of steam to be carried, an explosion had taken place, the principle would probably have had its application. The master in those cases would have done his full duty. But what was the proof in this case? It was full and conclusive of culpable neglect on the part of the master. The boiler was over thirteen years old. It was worn by slow corrosion in many places to the thickness of the sixteenth of an inch. There were many such thin places in it. The fibre of the iron was completely gone. The defects were such, that when the boiler was stripped they could have at once been detected by sounding with a chisel or hammer, and some of them were visible on the outside, when the boiler was stripped and exposed; and yet, during all the time it was used, it had never been stripped but once for repairs and examination, and on that occasion the examination was casual and superficial. And it never was once subjected to hydrostatic pressure, or any other test to prove its condition. It was shown, that no boiler ought to be used longer than five or six years without most thorough repairs; and that in England they are frequently tried by hydrostatic pressure; and that prudence requires such trials to be oftener made. The age of this boiler was well known to the master, the defendant; and the duty of keeping it in repair, or of ascertaining its condition, rested on the defendant; and if this be so, the principles contained in arts. 2296 and 3302 of our Code, would, we respectfully suggest, fix the liability upon him.

We did not deem it necessary, nor was it our wish, to fix any peculiar blame on any servant of the defendant; because we believed the evidence fixed it fully upon the defendant. *Qui non prohibit, cum prohiber potest et debet jubet.* It was doubtless under orders of defendant that this old and defective boiler was continued to be used; and the disaster was shown to have been caused by its great defects.

We respectfully ask the court, if a discharge from liability under such circumstances would not tend to give impunity to steamboat and railroad companies, and to deprive the public of the security which results from the wholesome terrors of the law. Such accidents are, doubtless, generally owing to the carelessness of servants; but if it be clearly proved that the master used insufficient and dangerous boilers, ought he to be permitted to escape responsibility by throwing the blame on his agents? Would not this "tend," in the language of C. J. Tilghman, "to introduce actual wrongs, and ideal remedies." A criminal prosecution of the servant would be generally abortive, and an action for damages worse than useless.

The judgment of the court, on a re-hearing, was pronounced by

EUSTIS, C. J. The plaintiff, the widow of the late *Jacob Hubgh*, suing in her own right, and as tutrix of her minor children, recovered a judgment of five thousand dollars against the defendants, for damages caused by the death of her late husband, by an explosion of the boiler of a locomotive engine on the Carrollton Railroad, while under his management, as an employé of the company, at a monthly salary. The explosion is charged to have occurred without any fault on his part, but solely from the negligence of the company in not providing a safe and proper conditioned boiler, &c.

This court reversed the judgment of the court below, and rendered judgment for the defendants. One of the grounds of the reversal was, that the action

could not be maintained; another was, that the facts in evidence brought the case <span style="float:right">Hugh</span> within the rule, that a master is not liable to a servant for damages resulting from the negligence of another servant, unless that other servant was habitually careless or unskillful.

A very elaborate argument for a re-hearing has been presented, in which the doctrine of the court, as to the action, has been reviewed.

All our sympathies are necessarily in favor of relieving the unfortunate dependents on the daily labor of the deceased; and the frequency of late of deplorable accidents of this kind, has created a general sentiment of indignation against those who, by their neglect or recklessness, are the cause of so much suffering among the relatives of the unfortunate victims. The impression, that they ought to be indemnified, results from a sense of justice which all right-minded men must acknowledge. Would not any one who had the misfortune to kill his fellow-man, at once feel a disposition to aid those whom his act, however called for by necessity, had reduced to want or deprived of their daily support? There are few men who would be insensible to this obligation; and accordingly we find in the most approved writers on natural law, a formal recognition of it as a duty. But the ground on which Grotius, with whom the idea originates, places it, excludes all idea of its forming a part of the civil law or being the basis of an action. Speaking of the indemnity to be made in cases of injury, he goes on to state some examples of what the indemnity, which the party committing the wrong is bound to make, consists. A man who has unjustly killed another ought to pay the expenses incurred for his physicians, and give to those whom the deceased was bound to support, as his father and mother, his women and his children, the amount of their maintenance, according to the age of the deceased. Thus Hercules, having slain Iphytus, paid a fine to his children, in order to secure more easily an expiation of his crime. A commentator of Aristotle says, that what one gives to the wife, the children and other dependents of the person slain, is *given in some sort.* "When I speak of homicide, I mean an unjust homicide, that is, one committed by a person who had no right to do the act from which the death has ensued. If one has the right to endanger the life of another, however one may have sinned against charity, as in case of not taking to flight, he is not responsible for the death, so far as relates to the indemnity of which we are now treating. Besides, a price may be put upon the life of a slave, who can be sold; but the life of a free person is not susceptible of valuation." The author refers, in a note to the title in lib. 9 of the Digest, which is the title *De his qui offenderint*, which, in case of a free man's having been injured by an object thrown into the street, provides, " *Cicatricem cautem aut deformitatis nulla sit æstematio, quia liberum corpus nullum recipit æstimationem:* There is no estimate made of the scars or deformity produced, because the value of the body of a free man cannot be estimated in money.

This author did not profess to treat of jurisprudence; but he declared the principles of natural law and the laws of nations, from the writings of the philosophers, poets, historians, and orators of antiquity. He does not confound one with the other, and distinguishes both from the civil or municipal law. He, it will be observed, is obliged to consider this indemnity rather as a matter of gift or liberality; an affair of conscience, rather than an obligation of strict duty.

Rutherford, in his Institutes of Natural Law, dissents from the opinion of Grotius, in his discrimination between the valuation of the life of a free man and of a slave, and thinks that in case of the slaying of either, his life can be esti-

mated according to the interest which those who survive have in it.   Book 1, c. 17, § 9.

It is understood that the present action is founded upon the direct injury to themselves by the death of *Hubgh,* from the causes alleged in the petition; and is not attempted to be maintained as a right transmitted to them through the deceased.   The right of action is claimed on the ground on which it has been allowed in France; the articles of the codes of that country and of Louisiana being identical, which provide that every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it.   Code Napoleon, 1382.   L. C. 2294.   A very thorough consideration of the subject brought us to the conclusion, that the interpretation and application of the article 1382 of the Code Napoleon, adapted by the Court of Cassation in relation to the responsibility of the slayer to the widow and heirs of the deceased, were not consistent with our jurisprudence, and consequently inadmissible.   We found no precedent for any such action, though, unfortunately, occasions for its exercise have been but too frequent within our borders; and with the learning and research which has distinguished our bar for nearly half a century, the singular fact remains unexplained, that up to the present suit no such right of action has been asserted.   There can have been but one cause for this; and that is, the universal conviction of the bench and the bar that no such action could be maintained.

It certainly is incumbent on the plaintiff to show that, under our laws, the death of a free person can be the ground of an action of damages.   That, as a general principle, no such rule prevailed under the Roman law, we think, may be affirmed.   If it existed, it has escaped the research of Gibbon and of Makelday; and the diligence of counsel has referred us to no text or commentator which authorizes the opinion that the action was allowed.   The Aquilian law gave actions for injury done by the death of slaves and certain animals, which it mentions by name.   The title *de his qui effunderint vel dejecerint,* thus provides for the case of a free man killed by something being thrown in the public way from a building.   If it is a free man who has been killed, *damni æstimatio non fit in duplum, quia in homine libero nulla corporis æstimatio fieri potest;* but in this case the fine is of fifty pieces of gold.   ff. lib. 9, tit. 3, § 3.   The law *de suspensis* is to the same effect, and had for its object the prevention of accidents in the public way.   They were penal laws, and the special provisions they contain are rather in affirmance of the non-existence of the principle which would give an action to the heir for damages caused by the death of his ancestor.

Far be it from us to undertake to state affirmatively, that any given text is not to be found in the mass of matter composing the *corpus juris civilis.*   Finding no rule laid down in any of the elementary writers on which the action could be maintained, and bearing in mind the principle so frequently recognized in the Digest, that the life of a free man cannot be made the subject of valuation, we thought that an action of this kind could not be maintained under the Roman law.   Digest 14, tit. 11, *De lege Rhodia de jacta,* § 2, 1.   Jacturæ summam pro rerum pretio distribui oportet.   Corporum liberorum æstimationem nullam fieri posse.   Digest 9, tit. 1, § 4.

The Spanish law provided with great particularity for the reparation of wrongs, and for the remedy to be exercised by and against heirs in these cases.   It would seem, that every possible case to be reached by the law was provided for; a recapitulation of them would rather afford mirth than instruction.   The only

case in which we discover any responsibility, except to punishment for homicide, <span style="float:right">HUBGH</span>
is that relating to barbers, who are required to exercise their trade in particular <span style="float:right">N. O. & C. R. R.</span>
places, so that they whom they shave may sustain no damage. The law provides, <span style="float:right">COMPANY.</span>
that if a barber be shaving a man, and any one push him in any manner, so that
he kill, wound or hurt the person whom he is shaving, he by whose fault it was
done will be bound to make reparation therefor, &c. This solitary case, if it gave
the heir an action for the death of his ancestor, would rather prove the necessity
for making a special provision for it, and presupposes the general rule to which
it is an exception. Partida 7, tit. 15, law 27; Ib., tit. 7 and 9. Institutes of the
Law of Spain. We can find nothing in the laws of Spain which authorizes this
action, or which presupposes any such right of action to exist, and are satisfied
that, as a general rule under both systems, actions for injuries to the person are
strictly personal; and that there is no recognized principle, in either, in which the
plaintiff's action can be maintained.

The obligation resulting from a *tort* can only be the ground of an action, when
the obligation is recognized and ratified by the law: for by far the greater por-
tion of the wrongs to which we are exposed in our artificial condition of society
the law does not afford any redress. The redress is of necessity confined to
legal rights, for which the law has provided an action or inflicts a punishment.
3 Black. Com. 23, 117. Pothier on Obligations, No. 1 and 197.

We now come to consider whether the plaintiff's right of action is authorized
by the articles of our code. The article 2294 of our Code provides, that every
act whatever of man that causes damage to another, obliges him by whose fault
it happened to repair it. The provisions of this article, however general and
comprehensive its terms may be, are found more than once recited in terms
equally general and comprehensive in the laws of the fifteenth title of the seventh
Partida. The article was inserted in the Code of 1809, at a time when the
Spanish laws were in force. It was put and retained to this time in the code,
not for the purpose of making any change in the law, but because it was a prin-
ciple which was in its proper place in a code; a principle which would be equally
recognized as a necessary conservative element of society, and equally obligatory,
whether it was formally enacted in a code or not. Would an injunction in an
article of a code *jus suum cuique tribuendi, or, sic utendi tuo ut alienum non lædas*
under the duties implied, be more extensive or more obligatory? Merlin, in giving
his conclusions before the Court of Cassation, in the case of *Michel, Reynier et
al*, respecting the article 1382 of the Code Napoleon, which is identical with the
article 2294 of our Code, says, " the principle laid down in article 1382 is not new.
It is drawn from the natural law; and long before the Napoleon Code, the Roman
laws had solemnly proclaimed it; long before that code, the French laws had recog-
nized and assumed its existence. Merlin, R. *verbo* Reparation Civile, § 2, 3, bis.

Toullier thus alludes to this article. See how the learned Domat, in his clear
and precise style, has developed the principles consecrated in our articles 1382
and 1383. "All losses, all damages which may come from the act of a person,
whether from imprudence, levity, ignorance of what he is bound to know, or
other like faults, however light they may be, ought to be repaired by him whose
imprudence or other fault has caused them. It is a *tort* that he has committed,
though he may have had no intention to injure." It is in this that the *quasi
delit* differs from the *delit* and *dol*. Toullier, vol. 11, § 153. Domat, Civil Law,
Book 2, tit. 8, § 4.

The argument is, that the article 2294 must be interpreted in the same sense
here as the article 1382 is interpreted in the courts of France; that so important

HUBGH
v.
N. O. & C. R.R.
COMPANY.
a provision would not have been taken literally from the French Code, without any restriction or reservation being made, unless it was designed to receive the same construction as it was known to receive in France. So far as the fact is concerned, of the interpretation given by the Court of Cassation to that article being known in Louisiana when the Code of 1809 was adopted, our impression is against it. The dates of the decisions of that court, cited by the learned counsel, are subsequent to that time ; and the declaration of the imperial attorney general, in the case just cited, in the year 1813, rather weakens the supposition of there being any fixed interpretation of the article, as contended for. Within the memory of several who are still actively engaged in the profession, there was a period in which the jurisprudence of that court was not generally known in Louisiana. Indeed, it was not until after the general peace, in 1815, that the means of obtaining that knowledge was afforded by the introduction of Toullier and other works, commenting upon the Code Napoleon. The course adopted by our predecessors, upon whom was imposed the delicate and difficult task of interpreting and applying the provisions of the codes—a course in which we have felt ourselves bound to continue, in expounding and applying these provisions—we think is an answer to the argument. Conceding it to be true, that the present jurisprudence is as stated by counsel, and that the decisions of the Court of Cassation, on this article, are correct—a proposition which we have no interest in questioning—does it follow, that our decisions ought to be the same on the article in our code, which is identical ? We think not ; and for this reason, that the systems to which the articles apply are not similar.

This court, and the former Supreme Court, have derived great assistance from the decisions of the Court of Cassation, (which on all proper occasions has been acknowledged,) on the articles of the Napoleon Code similar to those of our own code ; but the benefit to be derived from such decisions is necessarily limited to those cases in which the articles are to be applied to similar systems, or to a similar jurisprudence. A large portion of the Code of 1808 was taken from the Napoleon Code : the differences between the two codes resulted from the Spanish law being the law of Louisiana. The laws of Spain remained in force and unrepealed until 1828. Our courts were called upon to apply the articles of the code to the law as it existed at the time ; and the decisions made in this state of things form the present jurisprudence of the State.

It seems to be evident, that the decisions of the Court of Cassation, to whatever extent they may have been considered as furnishing a safe guide to the application of the articles of the Code of Louisiana, similar to those of the French Code, in cases in which the former jurisprudence was similar to that of France, would cease to be applicable in those subjects of law, in which the jurisprudence of the two countries was different. The application of the article of the Code Napoleon to be made, is to the law of France ; and would, under the sanction of that distinguished tribunal, furnish a safe rule in cases where the law was similar ; and, of course, no rule whatever, where the law was materially different. In the case, therefore, under consideration, the law being different in Louisiana from that of France, as the latter is assumed to be, in argument ; and the application of the article being to the law of Louisiana, and not to that of France, the import and sense of the article becomes entirely an open question ; and the responsibility of determining its application is thrown upon the court without the aid of any authority, and unrestricted by any interpretation.

Previous to the adoption of the Code Napoleon, the traces of the legislation of the conquerors of Gaul, were everywhere perceptible throughout the king-

dom, and the code itself has not entirely effaced them. Subject to the power of Rome for more than five centuries; conquered afterwards by the Franks; the Roman law and the Germanic customs became the sources of the law in France. In the south, the Roman law prevailed; being near the territory of Rome, the first conquered, and the last subjected to the power of the Franks. A part of the north also retained the Roman law; it having long remained separated from France. The rest of the north and the whole centre of France, where the Franks planted and maintained themselves, more particularly observed the Germanic usages. Hence, the distinction of the *pays de droit ecrit*, and the *pays de droit coutumien.* In the *pays de_ droit,* there were certain places and cities, which had their local customs in derogation and exception of the Roman law; as Bordeaux, Toulouse, Montpelier and others.

France, in its present extent, having been formed by the annexation of adjoining territories, they were permitted to maintain, as far as practicable, their laws and usages. Hence, several hundreds of different customs prevailed in the different portions of her territory, until the supreme authority of the Napoleon Code was established throughout. The authors of that immortal work, in its formation, permitted to remain whatever it was not necessary to destroy ; and as far as practicable, sought to make a compromise, as it were, between the customs and the Roman law.

Under the Roman law, any citizen could institute a prosecution for a crime. In France, the right was vested in the public officer; but the relations of the deceased, in case of homicide, had the power of prosecuting the slayer. The reparation sought partook of a punishment and a debt. It was adjudged equally in favor of the accused and the accuser : in favor of the accused, and against the accuser, if he was innocent; and in favor of the accused, if he maintained his accusation. Pothier, Procedure Criminelle, § 2. Merlin, Rep. *verbo* Reparation Civile.

The probability is, that originally all prosecutions for homicide were at the instance of the relatives of the deceased. Blackstone assigns a northern origin to this custom, which prevailed in England. The appeal spoken of as a criminal prosecution, denotes an accusation by a private subject against another, demanding punishment rather on account of the particular injury suffered than for the offence against the public. Black. Com., vol. 4, p. 313. The sum adjudged was known to the ancient jurisprudence of France under the name of *fine;* the same as that adjudged for the benefit of the owner. In the examination of this subject, we have not been able to find, in any of the authors, that this mode of prosecution had any definite origin; or that the right to receive reparation, on the part of the relation, for the death of the slain, had any foundation in the Roman law.

Conceding that it was the intention of the framers of the Code Napoleon to embrace the civil reparation of an injury caused by homicide to the relations of the deceased, and that the Court of Cassation decided correctly in the interpretation and application of the art. 1382; we do not feel authorized to give to the similar article of our code the same application, in a system of laws different from that prevailing in France, in which the Code Napoleon was to operate.

We consider it unquestionable, that no civil action can be maintained under the common law by the relations, for the death of a free person. The authorities which have been adduced and commented upon, we think, conclusively show it. Finding that no such action was ever instituted in this State, our inquiries were necessarily directed to the examination of the former jurisprudence of Louisiana, in order to ascertain whether the action could be based on any well

65

recognized principle in the Roman or the Spanish laws. If the uniform understanding of the bar, deducible from the fact that no such suit was ever brought, has recognized the prevalence of the same principle in this State, which has obtained in England and the United States; the present state of things, on this subject, it would not be proper to disturb for light reasons, or, for anything short of a clear and decided command of the law. There is nothing shown, which would authorize a court to abandon a course which has been followed by a people with whom a regard for all personal rights is paramount, and from whom we have derived a large portion of our laws, and been continued in by the States of the Union. In England, the law has been recently changed; and it will rest with the Legislative power alone to provide the remedy sought, if public policy requires its introduction.

. On the merits, we think the case is clearly with the defendants. We thought, that by the deceased's own want of care, he contributed to the disaster on which the plaintiffs found their action; and on that ground, as well as on that stated in the opinion of the court, resulting from the authorities cited, the plaintiffs have no claim for damages against the defendants.

The re-hearing is therefore refused.