STATE *v.* H. B. ELLIS et al.

The State may appeal in criminal cases where the indictment, charging an offence punishable
with death or imprisonment at hard labor, has been quashed before trial, or held bad upon a
demurrer.

Where there is a discrepancy between the English and French texts of a statute, the former must
prevail.

The English text is emphatically *the law*.   It was intended and is required that the laws should be
published and thus promulgated in both languages; but they are enacted, as required by the Con-
stitution, in the language in which the Constitution of the United States is written.   A *bona fide*
translation into French, and publication of the original and translation, is all that is required;
and a mistake in the translation is in the same category with a typographical error.

A person present aiding and abetting at the commission of an offence is a principal, and may be
punished as such; (overruling the decision in the case of the *State* v. *Hendry*, 10 An. 207)

APPEAL from the District Court of St. John the Baptist, *Duffel*, J.
    E. W. *Moïse*, Attorney General, for the State.   St. M. *Berault*, for de-
fendants.

SPOFFORD, J.   The State has appealed from a judgment of the Fourth Judi-
cial District Court, quashing an indictment preferred against the defendants for
an alleged assault with a dangerous weapon, and inflicting a wound less than
mayhem upon one *Joseph Vicknair*.

The appellees have moved to dismiss the appeal, upon the ground that the
State has no right of appeal in criminal cases.

Under the Constitution of 1812 the Supreme Court had no criminal jurisdic-
diction.   The evils resulting from an unsettled and discordant administration
of the criminal law by a multitude of tribunals, each empowered to decide in
a last resort, were found to be so great that in 1843 a special court was erected
with appellate jurisdiction in this class of cases, whose decisions were reported
as authoritative expositions of the criminal law for the guidance of courts of
the first instance.   The court was called "a Court of Errors and Appeals in
Criminal Matters."

The second section of the Act constituting it provided that "this court shall
have only appellate jurisdiction, with power to review questions of law; which
questions shall be presented by bills of exceptions taken to the opinion of the
Judge of the lower court, or by the assignment of errors apparent on the face

of the record, taken and made in manner and form as now provided for by law for appeals in civil cases."

The fifth section provided "that said court shall have jurisdiction of all questions of law arising in the progress of any prosecution for violation of any penal law of the State, where the punishment may be death or imprisonment at hard labor." Acts of 1843, 59.

Under this law the question arose, in a case quite parallel to the present, whether the State had a right to appeal as well as the accused. And it was held that the right of appeal existed in favor of the State from a judgment quashing an indictment. *State* v. *Jones*, 8 Rob. 573.

In the subsequent case of the *State* v. *Jones*, 8 Rob. 617, an appeal taken by the District Attorney from a similar judgment was entertained without question.

The Constitution of 1845, for the first time, invested the Supreme Court with criminal jurisdiction in certain specified cases. In Article 63 it was declared that the Supreme Court should have appellate jurisdiction only, in criminal cases on questions of law alone, whenever the punishment of death or hard labor may be inflicted, or when a fine exceeding three hundred dollars is actually imposed.

The phraseology of the corresponding Article in our present Constitution is slightly different. This court's appellate jurisdiction extends "to all criminal cases on questions of law alone, whenever the offence charged is punishable with death or imprisoment at hard labor, or when a fine exceeding three hundred dollars is actually imposed." Constitution of 1852, Art. 62.

In 7 An. 40, (*State* v. *Cheevers*,) our predecessors entertained an appeal on behalf of the State from a judgment quashing an indictment. This was under the Constitution of 1845. In 10 An 207, (*State* v. *Hendry*,) we entertained a similar appeal under the present Constitution. In neither of these cases, however, does there appear to have been a question made as to the right of the State to appeal.

We see no objection to the practice, provided it is limited to the class of cases found in the precedents, to wit: those where the indictment has been quashed before a trial, or held bad upon a demurrer, and where it purports to charge an offence punishable with death or imprisonment at hard labor.

If the prisoner has not been tried he has not been in jeopardy, and if a new indictment could be preferred after a prior one for the same offence has been quashed, there can be no greater danger in reinstating an indictment which has been erroneously quashed before a trial upon the merits.

The motion to dismiss is, therefore, overruled.

The appellants were indicted under the 11th section of the crimes Act of March 14th, 1855, (Session Acts, p. 131,): "Whoever shall, with a dangerous weapon, *or* with intent to kill, inflict a wound less than mayhem upon another person, shall, on conviction, be imprisoned not exceeding two years nor less than six months, with or without hard labor, and fined not exceeding one thousand dollars."

The French translation of this law in the Act of 1855 differs in two particulars from the English text: the copulative *et* is used instead of the disjunctive *or* in the first clause, making it necessary for the use of a dangerous weapon and the intent to kill to concur, in order to constitute the offence; and the phrase "wound less than mayhem," is translated "blessure qui la priverait de l'usage de l'un de ses membres," which would amount to mayhem.

The Act of March 14th, 1855, is a part of the revisory legislation of that year, and it appears that the errors of the old translation of the Act of 1829 have been copied and perpetuated in the new law.

The objection is now taken that, as the two texts are incompatible, there is no law whatever upon the subject matter; because the Constitution requires (Art. 129) that "the Constitution and laws of the State shall be promulgated in the English and French languages."

If this constitutional provision is, as contended by the appellees, not directory merely but mandatory, we do not see how it can avail them. For if the Act of 1855 has no binding force as to the class of offences charged, then the Act of 1829, from which a portion of it was taken, has not been repealed *quoad* that class of offences; for it is only laws upon the *same subject matter* upon which a provision is made in the new law that are repealed: and the argument of the appellees is, that the new law, being self-contradictory, goes for naught as to assaults with a dangerous weapon and assaults with intent to kill, and inflicting a wound less than mayhem or equivalent to mayhem.

But we do not think the argument admissible. The old provision of the Constitution of 1812 and 1845 has been retained in our present Constitution: "The laws, public records, and the judicial and legislative written proceedings of the State shall be promulgated, preserved and conducted in the language in which the Constitution of the United States is written." Constitution of 1812, Art. vi, sec. 15; Constitution of 1845, Art. 103; Constitution of 1852, Art. 100. We know that the practice of the legislative department under this provision has been to introduce and carry through the various stages of legislation bills in the English language alone. They are translated into French for enrollment by a clerk, but the statutes are adopted in the English only. They are not even required by the Constitution to be translated before receiving the Governor's signature.

The English text, therefore, of our ordinary statutes is emphatically *the law.* The French version is not the work of the two Houses and the Governor, but is a mere clerical labor, its correctness depending upon the skill and accuracy of the clerk employed.

Now, when the Constitution of 1845, in Article 132, introduced the provision that the laws should be promulgated in the English and French languages, it certainly did not intend to detract from the authoritative force of the English text in which, by a previous provision, (Art. 103,) it had declared the "legislative proceeding" should be "conducted." · It intended no more than that the laws passed in English should be translated into French before promulgation, and that the original and the translation should then be published and thus promulgated together. The English text was still to continue *the law* as expressed in the identical words of the law-maker. The French was to be only a translation of that law done by a clerk. The English was to be the original, the French a copy.

The promulgation of laws is an executive function. The mode of promulgation may be prescribed by the Legislature, and differs in different countries and at different times. "Elle consiste, en réalité, dans l'opposition faite par le chef de l'Etat, de la formule qui ordonne l'exécution de la loi." 1 Marcadé, No. 28.

Promulgation is the extrinsic act which gives a law, perfect in itself, executory force. Unless the law provides that it shall be executory from its passage or from a certain date, it is presumed to be executory only from its promulga-

tion. *Buhol* v. *Boudesquie*, 8 N. S. 433; *Merchants' Bank of New Orleans*, 2 An. 68; C. C., Articles 4, 5, 6 and 7. The printing of a law is not its promulgation.

By our present statute, (Act of 1855, 341,) which is substantially a reënactment of the law of 1827, (page 172,) "all laws enacted by the Legislature of this State shall be *considered* promulgated at the place where the State gazette is published, the day after the *publication* of such laws in the State gazette, and in all other parts of the State thirty days after the publication.

But it is to be presumed that when the framers of the Constitution declared that the laws should be "promulgated" in English and French, they used the term as synonymous with the word "published." The question then is, have the laws been "published" in the English and French languages? The particular law in question is the "Act relative to crimes and offences," approved March 14th, 1855. That law, composed of 127 sections, enacted in the English language only, but translated by a clerk into French, has been published in the State gazette, in the English in which it was passed and in the French into which it was translated by the clerk.

Can a few blunders of the translating clerk vitiate the law? We think not. The English text is paramount, and the tribunals are authorized to correct the translation if erroneous. The translation was not the act of the law-maker, and we are not bound by it. See the cases upon this mistranslation, *State* v. *Mix*, 8 Rob. 549; also 9 An. 313; 10 An. 141.

Still less do we think that these blunders make the promulgation void. Such errors are inevitable. Human language, at best, is an imperfect medium of human thought. The greater part of the time of courts is consumed in trying to find out what the Legislature meant, even where courts and Legislature speak the same vernacular. The difficulty is doubled when ideas obscurely expressed in one language are to be turned into another. If the error of a translating clerk can destroy or change the law, he holds the most important office in the State, with a veto power larger than that of the Governor. We do not think the Constitution contemplated a verbal exactness in the promulgation of laws, and that it suffices if there has been a *bona fide* translation of the original statute into French, and a publication of the original and the translation in the State gazette.

Clerical and typographical errors in the publication do not impair the validity of the law, which is to be found in the rolls themselves. And an error of translation should, we think, be placed in the same category. We therefore conclude that the law "relative to crimes and offences," notwithstanding a few inaccuracies of translation, has been promulgated in French and English in the sense of the Constitution.

It was because the District Judge thought differently that he quashed this indictment.

But two of the defendants, *Derby* and *Edrington*, contend that they should be discharged, because they are accused as aiders and abettors to a crime (inflicting a wound less than mayhem) which does not admit of accessories, and they rely upon the case of the *State* v. *Hendry*, 10 An. 207. But these parties are indicted as principals in the same count with the other defendant, so that the case of the *State* v. *Hendry* is not altogether in point. Moreover, on reviewing that case, we are not satisfied with its doctrine in the full extent to which it seems to have been carried.

50

A person *present*, aiding and abetting the commission of an offence, is a principal, and may be punished as such. We notice that in the revisory legislation of 1855, the expressions "aiders and abettors" in several of the statutes referred to in the *State* v. *Hendry* have been omitted as surplusage, and the argument drawn from this phraseology fails. Moreover the 11th section of the Act of 1855, relative to crimes, (page 149,) declares that "whoever shall be convicted as accessory before the fact to *any* crime or offence shall suffer the same kind and extent of punishment, according to the circumstances of the case, as might lawfully be inflicted upon the principal offender for such crime or offence."

This law, first enacted in 1818, seems to have been overlooked in the case of the *State* v. *Hendry*. If the doctrine of a portion of that case was correct, it would follow that an accessory before the fact to the crime charged in this indictment, but not present at its commission, could be punished as surely as the principal, while an accessory at the fact, or the person present aiding and abetting its commission, might not be punished at all.

We cannot admit this as a correct exposition of the legislative will, and the case relied upon by the appellees must be so far overruled.

It is, therefore, ordered, that the judgment be reversed, the indictment reinstated, and the cause remanded, to be proceeded in according to law, as against all the parties accused.