Mary H. SHELP and Genevieve M. McKinney, Appellants,

v.

NATIONAL SURETY CORPORATION, Appellee.

No. 20805.

United States Court of Appeals Fifth Circuit.

June 26, 1964.

**432**

Theodore J. Pfister, Jr., Kierr & Gainsburgh, New Orleans, La., for appellants.

Gerard M. Dillon, E. E. Huppenbauer, Curtis, Foster, Dillon & Huppenbauer, New Orleans, La., for defendant-appellee.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

▮ The question this diversity tort action presents is whether, under Louisiana law, the lessor or the lessee is responsible for repairs to the doors of leased premises. The case turns on the variance between the French and English texts of Article 2686 of the Code of 1825. That article was the predecessor to Article 2716 of the Louisiana Revised Civil Code of 1870 which was published only in English. The district court held that the 1825 French text of Article 2686, binding the lessee for repair of doors, prevails over the 1870 text of Article 2716. 218 F.Supp. 615. We affirm.

I.

▮ One of the two plaintiffs leased an apartment in the French Quarter in New Orleans; the other was her house-guest. The complaint alleges that an intruder gained access to the apartment through the failure of the front door to close properly, assaulted both ladies, and raped one of them. The plaintiffs sued the lessor's insurer under the Louisiana Direct Action Statute, LSA–R.S. 22:655,. alleging that the lessor was at fault "in failing to furnish a safe entrance door". The plaintiffs base their action on Article 2322 of the LSA–Civil Code:

> "The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."

The parties agree that the lessor would be liable to the lessee and to a third person lawfully on the leased premises only if he were responsible for repair of the door.

The district court granted the defendant's motion for a summary judgment on the ground that Article 2716 of the LSA–Civil Code relieves the lessor of liability for defects in the premises which the lessee is obliged to keep in repair. The first and last paragraphs of Article 2716 read:

> "The repairs, which must be made at the expense of the tenant, are those which, during the lease, it becomes necessary to make;
>
> *  *  *  *  *  *
>
> "To windows, shutters, partitions, shop windows, locks and hinges, and everything of that kind, according to the custom of the place."

Article 2716 is an exact copy of the English text of Article 2686 of the Code of 1825.[1] It contains no reference to doors. But the French version of Article 2686 includes repairs to "portes" (doors)

---

1. Except for several small differences in punctuation. The complete English text

of Article 2716 is: "Art. 2716. The repairs, which must be made at the expense

among the repairs the lessee must make.[2] The last paragraph of the French text reads:

"*Aux portes*, croisées, planches de cloison et de fermeture de boutique, gonds, tarjettes, (targettes) serrures et autres, suivant l'usage des lieux."

Correctly translated, this paragraph reads:

"*To doors*, casement windows, wooden partitions and shop shutters, hinges, bolts, locks and other things, according to the custom of the place." [3]

The French text of Article 2686 of the 1825 Code is identical with the French text of Article 30, Title VIII, p. 278, of the 1808 Code.[4] The English text of Article 30 follows the French version in that the lessee "is bound to keep in repairs the doors, etc." [5] This article is derived from Article 1754 of the Code Napoleon (1804) [6] or, possibly, from the

2. The complete French text of Article 2686 is: "Les réparations locatives sont celles qui deviennent necessaires pendant la durée du bail;

"Aux âtres, contre-coeurs, chambranles et tablettes de cheminés;

"Au recrépiment du bas des murailles des appartemens;

"Aux pavés et carreaux des chambres, lorsqu'il y en a seulement quelques-uns de cassés, et que tout let pavé, en general, n'est pas devenue mauvais par vétusté;

"Aux vitres, excepté qu'elles ne soient cassées en totalité, ou en leur plus grande partie, par la grêle, ou autres accidens de force majeure;

"Aux portes, croisées, planches de cloison et de fermeture de boutique, gonds, tarjettes, [targettes] serrures et autres, suivant l'usage des lieux."

3. Louisiana Law Institute, Compiled Edition of the Civil Codes of Louisiana, 3 Louisiana Legal Archives (1942).

4. The 1808 code is entitled, "A Digest of the Civil Laws Now in Force in the Territory of Orleans with Additions and Amendments Adapted to its Present System of Government".

of the tenant, are those which, during the lease, it becomes necessary to make:

"To the hearth, to the back of chimneys and chimney casing.

"To the plastering of the lower part of interior walls.

"To the pavement of rooms, when it is but partially broken, but not when it is in a state of decay.

"For replacing window glass, when broken accidentally, but not when broken either in whole or in their greatest part by a hail storm or by any other inevitable accident.

"To windows, shutters, partitions, shop windows, locks and hinges, and everything of that kind, according to the custom of the place."

5. The French text reads: "Art. 30. Les réparations locatives, sont celles qui deviennent necessaires pendant la durée du bail;

"Aux âtres, contre-coeurs, chambranles et tablettes de cheminées;

"Au recrépiment du bas des murailles des appartemens;

"Aux pavés et carreaux des chambres, lorsqu'il y en a seulement quelques-uns de cassés, et que tout le pavé, en général, n'est pas devenue mauvais par vétusté;

"Aux vitres, excepté qu'elles ne soient cassées en totalité ou en leur plus grande partie par la grêle ou autres accidens de force majeure;

"Aux portes, croisées; planches de cloison et de fermeture boutiques, gonds, targettes et serrures, et autres suivant l'usage des lieux."

The English text reads: "Art. 30. The repairs which must be made at the expense of the tenant are those of hearth, back of chimneys, chimney ornaments and interior walls, a tenant must also cause any broken tile used in the paving of rooms to be replaced, but he shall not be obliged to repair said pavement, if it is entirely broken or worn out; a tenant must replace at his own expense any window glass accidentally broken, but he cannot be compelled to replace them, if they have been broken either in whole or in their greatest part by a hail storm or by any other accident which cannot be foreseen. He is also bound to keep in repair the doors, window shutters, the partitions, the shop windows, the locks and every thing of that kind as is regulated by customs."

6. "Les réparations locatives ou de menu entretien dont le locataire est tenu, s'il n'y a clause contraire, sont celles désignées comme telles par l'usage des lieux, et, entre autres, les réparations à faire, * * * Aux portes, croisées, planches de cloison ou de fermeture de boutiques, gonds, targettes et serrures."

corresponding article of an earlier draft of that code,[7] the Projet du Gouvernement (1800).[8] Both the Code Napoleon and the Projet du Gouvernement require the lessee to repair doors of leased premises.

The plaintiffs point out that the legislature promulgated the present code, the Revised Civil Code of 1870, only in English. They argue that there is no ambiguity in Article 2716 and that in construing the Code, as in construing any legislative act, a court is bound by the plain wording of the law: where there is no ambiguity in the language of an article courts cannot change its meaning by resorting to the French text of the Code of 1825.[9] They rely on an all-fours case, Bradley v. Yancy, 1939, 2 Ct.App. La., 195 So. 110.

## II.

It is at least arguable that the catch-all phrase "everything of that kind, according to the custom of the place" creates an ambiguity. Repairs to a door are in the nature of repairs to windows, shutters, and partitions.[10] Thus, the lessee has been held liable for the repair of doorknobs.[11] Moreover, as a practical matter, it seems reasonable to have the

7. Martin, Cross, H. P. Dart, Franklin, and others have asserted that Moreau-Lislet and Brown based their work on a projet of the French Civil Code, principally because the numbering system of the Code of 1808 corresponds with that of the Projet du Gouvernement (1800) and because the Louisiana Code contains articles similar to those in the projet but omitted in the Code Napoleon. Martin, History of Louisiana 344 (1882); Cross, Successions XXIV (1891); Dart, The Sources of the Civil Code of Louisiana, Intro. to Saunders Lectures (1925), 13 La.Bar Ass'n Proc. 21, 70 (1911). Franklin, Some Observation on the Influence of French Law on the Early Civil Codes of Louisiana, in Le Droit Civil Français (Montreal 1936) 834. W. K. Dart has stated that the commissioners followed the last projet. Dart, The Louisiana Judicial System, 1 La.Dig.Ann. 20 (1917). Tucker believes that the 1804 Code was taken largely from the Code Napoleon. Tucker, The Code and Common Law in Louisiana, 29 Tul.L.Rev. 739, 745 (1955). See also Davidson, Stare Decisis in Louisiana, 7 Tul.L.Rev. 100 (1932).

8. "Les réparations sont celles qui deviennent nécessaires pendant la durée du bail, * * * Aux portes, croisées, planches de cloison ou de fermeture des boutiques, gonds, targettes et serrures, lorsqu'il, en manque, ou qu'elles ont été détachées par violence, ou cassées et endommagées autrement que par vétusté, ou par leur mauvaise qualité;
   "Et autres désignées par l'usage des lieux."

9. Article 13 of the LSA–Civil Code provides: "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit."

10. In Lowe v. Home Owners' Loan Corp., 1941, Ct.App., 1 So.2d 362, affirmed 199 La.·676, 6 So.2d 726, a third person rightfully on leased premises was injured when, in leaving the house, she pulled hard on a door knob in an effort to jam the door against the frame; the knob pulled loose precipitating the plaintiff across a porch and onto the sidewalk. For some time the lock had failed to catch when the door was closed, making it necessary that great force be exerted on the knob. The Court of Appeal said: "Even if a knob be not considered as a part of the lock, and, therefore, not within the express language of article 2716, still it would be included in the rather broad phrase 'and everything of that kind, according to the custom of the place'." 1 So.2d at 368. The Supreme Court of Louisiana, in affirming the Court of Appeal, stated the rationale for Article 2716: "Because of his loss of possession and because during the existence of the lease the mere use of the property brings about the need for a number of minor repairs, the law as expressed in Article 2716 reduces the burden of responsibility imposed on the owner by placing some of the responsibility · on the tenant. Window frames, window glasses, shutters, locks and hinges are parts of the leased premises that are subject to constant use. Because of that use, Article 2716 makes it the duty of the tenant who is in possession and not the landlord who is out of possession to make the minor repairs enumerated in the Article when, during the existence of the lease, the occasion arises therefor."

11. Moore v. Aughey, 1918, 142 La. 1042, 78 So. 110; Lowe v. Home Owners' Loan Corp., supra, note 10.

same party liable for all the repairs to a door. Since the lessee must repair the locks and hinges of doors, it is hard to believe that the legislature deliberately intended to release the lessee from liability to repair doors.

More importantly, in Louisiana, as in all civilian jurisdictions, the Civil Code is more than an ordinary legislative act. The Code, doctrinally, constitutes the whole body of private law. A statute, on the other hand, is small in scope, narrow in its objective and, unless it is a petit code, such as the Louisiana Trust Code, is intended to deal with a specific mischief or a specific need. The relation between a code and a statute in the field of private law may be analogized to the relation between the common law and a statute in derogation of the common law.[12] Geny and other outstanding civilians have written learnedly on the subject.[13] We quote a less renowned authority but a highly respected Louisiana scholar, George Dreyfous, because his comment was provoked by the Bradley v. Yancy misconstruction of Article 2716:

"If the Code were to be construed as an ordinary statute, the Act of 1828 [repealing all civil laws in effect before the promulgation of the Code of 1825] would have created anarchy, since it is manifestly impossible to digest all of the laws of a complex society in a single volume less than one-half of the size of the Acts of 1840. The very nature of a

---

12. cf. (1) California Civil Code, Section 4: "The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this Code. The Code establishes the law of the State respecting the subjects to which it relates, and its provisions are to be liberally construed with a view to effect its objects and to promote justice." (2) The Swiss Code, Article 1: "The Code governs all questions of law which come within the letter or the spirit of any of its provisions." (3) French Civil Code, Article 4: "A judge who refuses to decide a case on the pretext that the law is silent, obscure or insufficient, may be prosecuted as being guilty of a denial of justice." Article 21 of the LSA–Civil Code, which is based on the Projet, reads: "In all civil law matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."

The intentional omission of "doors" in Article 2716 would require the court to determine whether the lessee should be liable, reasoning by analogy, aided by usage. It would not mean, automatically, that the lessor is the party bound to repair doors. See Franklin, The Historic Function of the American Law Institute: Restatement as Transitional to Codification, 47 Harv.L.Rev. 1367, 1377–9 (1934); Sereni, The Code and the Case Law, in The Code Napoleon and the Common-Law World (Ed. by Schwartz 1956) 54, 57–63.

13. The classic account is Geny's "Méthode D'Interprétation et Sources en Droit Privé Positif", recently translated by the Louisiana Law Institute (1963). Franklin describes the civilian method of interpretation as follows: "The problem may be controlled by a code article. Controversy then will center about the interpretation of this article. For this there is an elaborate apparatus, the classic account of which is given by Geny, and by Savigny in the entire first volume of his *System*. The logical interdependence of the various texts, ethical notions, systematic considerations, contextual influences, historical factors, consequential effects, and the like, receive consideration. The important thing is the elaborate effort to ascertain the genuine significance of the text. In this there is no mere reliance upon the holdings of prior decisions. Indeed, the *code civil* expressly forbids decisions to be made so as to form a general rule of law, and anyone who examines Dalloz and Sirey will not find reference to authoritative materials other than the code texts. There is no *stare decisis* of interpretation. Furthermore, the interpretative process is not confined to the judges alone. The chief reliance is rather upon the theoretician as he has indicated his opinions in doctrinal writing. Interpretation of statutory texts is not the esoteric job of judges. It is an intellectual process in which law teachers have played a greater part than judges." Franklin, The Historic Function of the American Law Institute: Restatement as Transitional to Codification, 47 Harv.L.Rev. 1367, 1377 (1934).

code requires that analogies be drawn from its express provisions in deciding cases for which no exact rule can be found in the code and that when an article abstracts the preexisting law the earlier jurisprudence be considered in cases not covered by the abstract." [14]

To parallel Marshall's famous maxim, we must never forget that it is a Code we are expounding.

■ True, Article 6, Section 15, of the Louisiana Constitution of 1812 provided that all laws enacted by the legislature must be written and promulgated in the language in which the United States Constitution was written. In accordance with that requirement, the Louisiana legislature, from 1808 to 1867, enacted its statutes in English. A *clerk* then translated the statutes into French for publication. The constitutional provision and the legislative practice very properly gave rise to the rule that the English text of Louisiana statutes controls.[15] State v. Ellis, 1857, 12 La.Ann. 390, 392. State v. Mix, 1844, 8 Rob., La. 549; Williams v. Robinson, 1850, 5 La.Ann. 110; Parish of Lafourche v. Parish of Terrebonne, 1882, 34 La.Ann. 1230. There can be no objection to this canon. The French text of a Louisiana statute represented not the legislature's enactment of the original text but a hired clerk's translation.

This was not the case with the Codes of 1808 and 1825. Viterbo v. Friedlander, 1887, 120 U.S. 707, 7 S.Ct. 962, 30 L.Ed. 776, on which the plaintiffs rely, is simply wrong. Failure of counsel to present the historical background led the United States Supreme Court into mistakenly applying a rule of statutory construction that was inapplicable to the Civil Code.

### III.

The Code of 1808 set the pattern for the Code of 1825. At the time, all Louisiana laws were published, in the newspapers and in book-form, in French and English.[16] The statute directing Louis Moreau-Lislet and James Brown to codify the law did not specify the language to be used,[17] but since the legislature authorized a translation [18] into English, the legislature understood that the *projet* was prepared in French. The act which adopted the Code of 1808 required that it be printed in both French and English [19] and the legislature directed that in case of "any obscurity or ambiguity, fault or omission, both the English and French texts shall be consulted, and shall mutually serve to the interpretation of one and the other." [20]

■ Any doubt as to whether the Code of 1808 was originally drafted in French was dispelled by Moreau-Lislet himself. In Dufour v. Camfranc, 1822,

14. Dreyfous, Partial Defacement of Olographic Wills, 15 Tul.L.Rev. 272 (1941).

15. "We know that the practice of the legislative department under this provision [the article of the Constitution requiring that acts be passed in English] has been to introduce and carry through the various stages of legislation bills in the English language alone. *They are translated into French for enrollment by a clerk,* but the statutes are adopted in the English only. They are not even required by the Constitution to be translated before receiving the Governor's signature. *The English text, therefore, of our ordinary statutes is emphatically the law.* The French version is not the work of the two Houses and the Governor, *but is a mere clerical labor,* its correctness dependent upon the skill and accuracy of *the clerk*

*employed.*" (Emphasis supplied.) State v. Ellis, 1857, 12 La.Ann. 390, 392.

16. Territorial Acts of 1805, Chap. XVIII, p. 90.

17. Territorial Acts of 1806, p. 218.

18. See Territorial Acts of 1807, Chap. XXXI, p. 190–2.

19. Territorial Acts of 1808, Chap. XXIX, p. 120.

20. Ibid, § 5, p. 128. At first, the Louisiana Supreme Court attempted to comply with this mandate by applying the more comprehensive text, Chretien v. Theard, 1824, 2 Mart. (N.S.) 582, and by holding that compliance with either text was sufficient, Touro v. Cushing, 1823, 1 Mart. (N.S.) 425.

11 Mart., O.S. 675, 688, 701, Moreau-Lislet called attention to a discrepancy between the English and French texts of Article 7. The report of the decision quotes him as saying:

"We have nothing to do with the imperfections of the translations of the Code. The French text, in which it is known that work was drawn up, leaves no doubt."

In 1822 the Louisiana legislature appointed Moreau-Lislet, Edward Livingston, and Pierre Derbigny to revise the Code by amending it "in such manner as they will deem advisable" and by adding to it "such of the laws as are still in force and not included therein." [21] As appears from the *projet*, all articles of the 1808 Code not amended or deleted were transferred to the new code in their original French.[22] Among these was Article 30, Title VIII, p. 278, the progenitor of Article 2716 of the 1870 Code. The redactors, therefore, had no intention of changing the sense of the article.

Unfortunately, the English translation of the French text of the Civil Code of 1825 and, for that matter, the Code of Practice of 1825, was spectacularly bad. The Supreme Court of Louisiana has said:

"The definition relied on from the English side of one of the Articles of the Code proves nothing but the ignorance of the person who translated it from the French." [23]

Edward Dubuisson, Sr., in his study of the errors in translations in the Codes of Louisiana, has written:

"The conclusion is, therefore, inevitable that the originals of the Code of Practice and of the Civil Code of 1825, as well as the original of the Code of 1808, were written in French. This is very unfortunate for Louisiana jurisprudence because even where the translations do not contain misleading errors, the vigor, the spirit, the clarity and finish of the originals are lost in the translations. Take, for instance, Article 578 of the Code of Practice relative to devolutive appeals. The French text is not only full and complete but as clear and limpid as purest crystal, while the English text is abbreviated and deficient in clearness * * *. ¶ The errors, omissions and ambiguities of the translations are so numerous that an extended review of them would take us entirely beyond the limits of this paper." [24]

The Code of 1825 contained a repealing clause (Article 3521). Uncertainty as to its effect, however, because of a Supreme Court decision,[25] led the legislature to adopt Act 40 of 1828, definitively repealing the Code of 1808. Making doubly certain, Act 80 of 1828 expressly abrogated the civil law in effect before promulgation of the Code of 1825.[26] Un-

21. La.Acts of 1823, p. 88, pursuant to resolutions adopted March 14, 1822.

22. The projet included only the "Additions and Amendments to the Civil Code." See Title, Republication of the Projet of the Civil Code of Louisiana of 1825, Louisiana Legal Archives, Vol. 1. "The amendments * * * to the old Code were submitted to the Legislature and with some slight alterations adopted. But the remaining provisions in it [the old Code] did not pass a second time under the view of the legislature, nor were they reenacted." Flower v. Griffith, 1827, 6 Mart., N.S., 89.

23. Egerton v. The Third Municipality of New Orleans, 1846, 1 La.Ann. 435, 437.

24. Dubuisson, The Codes of Louisiana (Originals Written in French; Errors of Translation), 25 La.Bar Ass'n Proc. 143, 149 (1924).

25. The Court held that the omission in the 1825 Code of articles in 1808 Code did not constitute a repeal of the earlier articles. Flower v. Griffith, 1827, 6 Mart. (N.S.) 89. cf. Reynolds v. Swain, 1839, 13 La. 193; Hubgh v. New Orleans & Carrollton R.R. Co., 1851, 6 La.Ann. 495; Moulin v. Monteleone, 1928, 165 La. 169, 115 So. 447.

26. Act 40 of 1828 expressly repealed all articles contained in the Code of 1808, and all articles not reprinted in the new code, "except so much of title tenth as is

like the earlier code, *the Revised Civil Code of 1870 contains no repealing clause. As the title of the enacting statute states, that Code was only "to amend and reenact" the Code of 1825.* The purpose of the 1870 revision was not to codify in the sense that the Code Napoleon is a codification or to recodify in the sense that the Louisiana Code of 1825 is a recodification. "Codification, in the civil law sense of the word, always implies a new start, regardless of whether the former rules are completely changed or merely remodeled." [27] The limited purpose of the 1870 revision was to delete the articles relating to slavery and to integrate the codal amendments since 1825. Adoption of the 1870 Code therefore did not, either in itself or in terms, indicate any intention to change the unamended articles of the Code of 1825.

Before the Civil Code of 1870 was adopted, the Supreme Court of Louisiana consistently held that the French text prevailed. Durnford v. Clark's Estate, 1831, 3 La. 199; Walls v. Smith, 1832, 3 La. 498, *seriatim* opinion of Judge Porter, followed in Fowler v. Phillips, 1925, 159 La. 668, 106 So. 26; Davis v. Houren, 1843, 6 Rob. 255; Buard v. Lemée, 1845, 12 Rob. 243; Egerton v. Third Municipality of New Orleans, 1846, 1 La.Ann. 435; Beaulieu v. Ternoir, 1850, 5 La.Ann. 476. And after the Code was adopted, Louisiana courts consistently applied this canon. Phelps v. Reinach, 1886, 38 La.Ann. 547; Jurgens v. Ittman, 1895, 47 La.Ann. 367, 373, 16 So. 952; Commercial Germania Trust Service & Savings Bank v. White, 1919, 145 La. 54, 81 So. 753; Straus v. New Orleans, 1928, 166 La. 1035, 118 So. 125; Sample v. Whitaker, 1931, 172 La. 722, 135 So. 38; Crawford v. Alatex Construction Service, Inc., 1959, La.App., 120 So.2d 845. Dubuisson has pointed out that Phelps v. Reinach "was decided in 1886 long after the adoption of the Code of 1870." [28] John H. Tucker, Jr., using the language of Phelps v. Reinach, states categorically, *"Today the French text prevails where there is a conflict between the two texts."* [29] (Emphasis supplied.) See Notes, 3 La.L.Rev. 452 (1941), 15 Tul.L.Rev. (1940), and 15 Tul.L.Rev. 272 (1941), all highly critical of Bradley v. Yancy. For additional comment see Hood, The History and Development of the Louisiana Civil Code, 33 Tul.L.Rev. 7, 16 (1958); Tucker, The Code and the Common Law in Louisiana, 29 Tul.L.Rev. 739, 746 (1955); Note, 19 La.L.Rev. 18 (1958); and Note, 33 Tul. L.Rev. 16 (1958). This Court has accepted the French Text of the 1825 Code as controlling. Morton Trust Co. v. American Salt Co., Cir.Ct. E.D.1906, 149 F. 540; United States v. Harang, 5 Cir. 1947, 165 F.2d 106, cert. den'd 1948, 334 U.S. 811, 68 S.Ct. 1017, 92 L.Ed. 1743; Commissioner v. Gray, 5 Cir. 1947, 159 F.2d 834. See especially Judge Lee's clear and compelling exposition in Harang in which this Court held that the word "profits" as used in Article 2402, defining community property, is an erroneous translation of the 1825 French text and must be read to mean "fruits".

■ Clutching Erie, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the plaintiffs insist that Bradley v. Yancy compels this Court to reverse the judgment below. Bradley v. Yancy is the only decision squarely in

---

embraced in its third chapter, which treats 'of the dissolution of communities and corporations' ". See Durnford v. Clark's Estate, 1831, 3 La. 199, as to the effect of these acts on articles in the 1825 Code which were reenactments of articles in the 1808 Code.

27. Brierly, The Codification of International Law, 47 Mich.L.Rev. 2, 3 (1948). Except for deletion of the slavery articles "the Code of 1870 is substantially the same as the Code of 1825, and hence the

Code of 1870 really represented an 'amendment' rather than a 'revision' in the ordinary sense." Morrison, The Need for a Revision of the Louisiana Civil Code, 11 Tul.L.Rev. 213, 228 (1937). See also Florence, Revision of the Laws of Louisiana, 5 La.Bar Ass'n Proc. 27, 28 (1904).

28. Dubuisson, supra, note 22 at p. 148.

29. Tucker, Source Books of Louisiana Law, 6 Tul.L.Rev. 280, 291 (1932).

point. In that case the court, refusing to read the word "doors" into Article 2716, did indeed hold the lessor liable under Article 2322 for injuries caused by a defective door.[30] Bradley v. Yancy is a single, aberrant deviation from the principle established in Phelps v. Reinach, Straus v. New Orleans, and Sample v. Whitaker, and other cases. The Supreme Court of Louisiana granted a writ in Bradley v. Yancy, but the proceedings were dismissed by agreement of the parties. Erie does not command blind allegiance to a case on all fours with the case before the court. There is no Erie obligation when there is "persuasive data that the highest court of the state would decide otherwise" than the intermediate appellate State court. West v. American Telephone & Telegraph Co., 1940, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139. Here the Erie obligation is to the Code, the "solemn expression of legislative will". Article 1.

### IV.

■ The Louisiana legislature was well aware that its great jurisconsults prepared the 1808 Code and 1825 Code in French and based the Codes on French and Spanish sources. Livingston has pointed out that the codification in part was motivated by anti-English and anti-common-law feeling in Louisiana.[31] The primacy of the civil law, carrying with it many civilian concepts and terms for which there are no accurate English equivalents,[32] makes the primacy of the French text of 1825 logical and inevitable. This is one of the inarticulated premises on which the Code rests. The legislative intention is manifest when the particular codal article in question is derived from civilian sources and when there is no reason to think that the legislature intended the 1870 English version to change the legal content of the article. No inadvertent omission or error by some hack translator is entitled to precedence, no matter how plain the English, when it produces a result contrary to established civil law as stated in the Codes of 1808 and 1825.

We hold: Article 2716 of the Code of 1870 must yield to the French text of Article 2686 of the Code of 1825. The controlling fact is the derivation of the article from a civilian source, here the Code Napoleon by way of the Code of 1808. Reading Article 2716 with its antecedents in light of the historical background of the Louisiana Codes, the result we reach represents the Louisiana legislature's will.

The judgment is affirmed.

30. The Court of Appeal admitted that if it followed the decisions of the Louisiana Supreme Court it "would be compelled to insert and add the word 'doors' to the last paragraph of article 2716". It argued that Article 13 of the Code relieved it of that necessity. (See note 9) The Code is "no different from any other legislative act * * * and there is no justification in law for adding to or taking from any article of the act (Revised Civil Code)." 195 So. at 113.

31. Complete Works of Edward Livingston on Criminal Jurisprudence (1873), 87. "The Anglo-American common law was regarded as an immediate menace for it was ungraspable because of its language and its weak juridical method". Franklin, Concerning the Historic Importance of Edward Livingston, 11 Tul.L.Rev. 163, 211 (1937).

32. Dreyfous, criticizing the Bradley v. Yancy rule, suggests: "A better rule is to prefer the French text when it is apparent that it is taken from an article of the French Code, as in such cases, the English text is a translation of the French, and the redactors would not purposely have modified the French text by an error in translation." Comment, supra, note 12.