Sidney C. GREEN, etc., Plaintiff,

Joni Green, Individually and on Behalf of the Minor Child, Jennifer Green, Plaintiffs–Appellants,

v.

Leslie WALKER, M.D., Defendant–Appellee.

No. 89–3569.

United States Court of Appeals, Fifth Circuit.

Sept. 6, 1990.

Russ M. Herman, Tonia D. Aiken, Mark R. Wolfe, Herman, Herman, Katz & Cotlar, New Orleans, La., for plaintiffs-appellants.

Franklin Beahm, Barbara Reilley Athmann, Harold A. Thomas, Thomas, Hayes & Beahm, New Orleans, La., for defendant-appellee.

Before WISDOM, POLITZ, and JOHNSON, Circuit Judges.

POLITZ, Circuit Judge:

Joni Green, individually and on behalf of her minor child, appeals an adverse summary judgment which dismissed her claims against Leslie Walker, M.D., on the grounds that Dr. Walker owed Sidney Green, her now deceased husband, no duty of care in the conduct of an annual employment physical. Holding that the examining physician-examinee relationship which existed gave rise to an obligation to perform the examination with due care and to appropriately report thereon, we reverse and remand for further proceedings.

### Background

Sidney Green was employed as an offshore cook by ARA/GSI International. As a condition of continued employment ARA/GSI required that its employees undergo an annual physical examination that included a thorough examination of the physical systems, a urine test, and x-rays of the chest and spine. ARA/GSI contracted with Dr. Walker to conduct these examinations in accordance with an outlined protocol. Green submitted to his annual employment physical with Dr. Walker on May 6, 1985. According to the report submitted to ARA/GSI, Dr. Walker found all test results normal and classified Green as "employable without restriction," the best possible rating on the report. Approximately one year later Green was diagnosed with lung cancer, necessitating extensive diagnostic and surgical procedures.

Sidney and Joni Green, individually and on behalf of their minor daughter, filed suit against Dr. Walker, claiming that he had negligently failed to diagnose the beginnings of the cancer at the time of the May 1985 physical examination, and had failed to disclose these findings timely, thus lessening Sidney Green's chances of survival and reducing his life expectancy. Sidney Green has since died. Dr. Walker moved

for summary judgment contending that his examination of Green had been conducted pursuant to a contract with Green's employer and that therefore no physician-patient relationship, on which a malpractice claim could be based, existed between him and Green. The district court granted summary judgment and Joni Green timely appealed. The sole question posed on appeal may be stated thusly: Did Dr. Walker have a duty to Sidney Green to perform the prescribed examination with due care, consistent with the medical skills he held out to the public, and to report his findings, particularly any finding which appeared to pose a threat to the physical or mental health of Sidney Green? The district court answered this question in the negative. We now answer it affirmatively.

*Analysis*

The traditional malpractice paradigm.

It is a long-established principle of law that liability for malpractice is dependent on the existence of a physician-patient relationship. Whereas malpractice liability lies primarily in tort, *see Kozan v. Comstock,* 270 F.2d 839 (5th Cir.1959); *Sciacca v. Polizzi,* 403 So.2d 728 (La.1981), the existence of the traditional physician-patient relationship on which such liability hinges uniformly has been held to depend upon the existence of a contract, express or implied, that the doctor will undertake to treat the patient or at least engage in diagnosis as a prelude to treatment. *See What Constitutes Physician–Patient Relationship for Malpractice Purposes,* 17 ALR4th 132, 135–36.

Emphasizing a distinction between treatment and a consultative physical examination conducted at the request and for the benefit of a third party, state courts addressing the issue generally have held that no physician-patient relationship exists between "(a) a prospective or actual insured and the physician who examines him for the insurance company; or (b) a prospective or actual employee and the doctor who examines him for the employer." *Hoover v. Williamson,* 236 Md. 250, 203 A.2d 861 (1964); *see Ervin v. American Guardian*

*Life Assur. Co.,* 376 Pa.Super. 132, 545 A.2d 354 (1988); *LoDico v. Caputi,* 129 A.D.2d 361, 517 N.Y.S.2d 640 (1987); *Thomas v. Kenton,* 425 So.2d 396 (La.App. 1982); *Keene v. Wiggins,* 69 Cal.App.3d 308, 138 Cal.Rptr. 3 (D.Ct.App.1977); *Rogers v. Horvath,* 65 Mich.App. 644, 237 N.W.2d 595 (1975); *Wilcox v. Salt Lake City Corp.,* 26 Utah 2d 78, 484 P.2d 1200 (1971); *Lotspeich v. Chance Vought Aircraft,* 369 S.W.2d 705 (Tex.Civ.App.1963). *Erie* obligations.

Focusing on our obligations as a federal court sitting in diversity, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), both sides to this dispute earnestly contend that Louisiana caselaw mandates our resolution of this appeal in their favor. Mrs. Green contends that we must reverse the district court, citing the decision of the Louisiana Supreme Court in *Ducote v. Albert,* 521 So.2d 399 (La.1988). Dr. Walker counters that we are bound to follow the lead of an intermediate appellate court in *Thomas v. Kenton,* 425 So.2d 396 (La.App.1982), and affirm the district court.

Albeit persuasive, and of some guidance as we walk a dimly blazed trail, neither case is truly dispositive. In *Ducote* the Louisiana Supreme Court adopted the "dual capacity" doctrine, holding that the Louisiana Worker's Compensation Law does not provide a company doctor with immunity from civil liability for medical malpractice. As Dr. Walker points out, however, *Ducote* involved a situation in which the plaintiff-employee had seen the company physician for treatment of his injured hand; whether the physician had rendered "treatment," thereby creating a physician-patient relationship in the traditional sense, was not in dispute. *Ducote,* therefore, arguably may stand merely for the proposition that a company physician committing malpractice may not raise his co-employee status as a defense to a malpractice claim.

Alternatively, *Thomas v. Kenton* arguably is on all fours with the case at bar. Thomas's employer had retained a physician to conduct annual or biennial physical examinations of its employees to assess

their continued employability; the examinations were neither initiated by Thomas nor conducted to diagnose and treat a particular ailment. Thomas sued the examining physician, claiming that he had failed in the course of the examination to diagnose and disclose a condition from which Thomas suffered, thus allowing the condition to progress without Thomas's knowledge.

Adopting the reasoning of other jurisdictions that had considered "strikingly similar" situations, such as *Hoover* and *Lotspeich,* the *Thomas* court held that there was no physician-patient relationship between a prospective or actual employee and the doctor conducting an examination at the employer's request. In the absence of such a relationship, the *Thomas* court concluded, there could be no liability for malpractice. Above all, the *Thomas* court was impressed that it was the employer, not the employee, who was the intended beneficiary of the doctor's contractual obligations:

> The doctor was hired by the company for their benefit and any benefit that their employees receive from having a doctor there to conduct these examinations was only secondary in nature.

*Thomas,* 425 So.2d at 400.

■ The directive of *Erie* in a diversity case limits but does not eliminate the federal decision-making process for *Erie* "does not command blind allegiance to [any] case on all fours with the case before the court." *Shelp v. National Surety Corp.,* 333 F.2d 431, 439 (5th Cir.), *cert. denied,* 379 U.S. 945, 85 S.Ct. 439, 13 L.Ed.2d 543 (1964). The decision of an intermediate appellate state court guides, but does not necessarily control a federal court's determination of the applicable state law. *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *Joe E. Wood v. Armco, Inc.,* 814 F.2d 211 (5th Cir.1987); *Shelp,* 333 F.2d at 439 ("There is no *Erie* obligation when there is 'persuasive data that the highest court of the

state would decide otherwise' than the intermediate appellate ... court.").

If anything, this flexibility is even greater when a federal court sits as an *Erie* court applying the Louisiana civil law. In such cases, "the *Erie* obligation is to the [Civil] Code, the 'solemn expression of legislative will.'" *Shelp,* 333 F.2d at 439 (quoting the very first article of the Louisiana Civil Code).[1] The Louisiana Supreme Court has taken great pains to "plainly state that, particularly in the changing field of delictual responsibility, the notion of *stare decisis,* derived as it is from the common law, should not be thought controlling in this state." *Ardoin v. Hartford Acc. & Indem. Co.,* 360 So.2d 1331, 1334 (La.1978). While caselaw in the State of Louisiana is acknowledged as "invaluable as previous interpretation of the broad standard of Article 2315" [the general standard of conduct in torts referred to as "the keystone of responsibility," *Id.* at 1335], it is nonetheless properly regarded as "secondary information." *Id.* at 1334. As our constant focus, "we must never forget that it is a Code we are expounding." *Shelp,* 333 F.2d at 436.

Duty of care—general obligation.

■ Unlike the fact-oriented questions of breach and causation, which we do not address today, determining the existence of an obligation or duty in particular situations is a question of law. *See Pitre v. Opelousas General Hosp.,* 530 So.2d 1151 (La.1988). The Louisiana Civil Code establishes the standard of conduct required of all persons in Louisiana in all of their relationships in broad, simple terms: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La.Civ.Code art. 2315. The drafters of the Civil Code made no effort to define the concept of "fault." Instead,

> [they] conceived of fault as a breach of a preexisting obligation, for which the law orders reparation, when it causes damage to another, and they left it to the

---

**1.** Article 1 of the Louisiana Civil Code in its simple majesty declares: "Law is a solemn expression of legislative will."

court to determine in each case the existence of an anterior obligation which would make an act constitute fault. *Pitre,* 530 So.2d at 1156 (citing 2 M. Planiol, *Treatise on the Civil Law,* Part 1 §§ 863–865 (1959)). In determining whether article 2315 contemplates the existence of a previously undefined duty, the Louisiana Supreme Court has looked to the foreseeability of the risks involved as well as "policy considerations, including social, moral and economic elements." *Lejeune v. Rayne Branch Hosp.,* 556 So.2d 559, 568 (La.1990).

## Duty of care—physicians.

Like any person, a physician "is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." La.Civ. Code art. 2316. As the Louisiana Supreme Court acknowledged in *Pitre,* however, the Louisiana Legislature has expressly provided that a physician's professional status carries with it additional legal obligations. A physician practicing as a general practitioner must possess the degree of knowledge or skill possessed and exercise the degree of care ordinarily exercised by physicians in active practice in a similar community under similar circumstances. La. R.S. 9:2794(A)(1). *Pitre,* 530 So.2d at 1156.

The issue presented by the instant case is whether Louisiana jurisprudence supports an extension of the traditional physician-patient relationship to admit of a legal relationship between examining physician and examinee, thus imposing the physician's duty of due care in that situation. The Louisiana Supreme Court's recent enunciation of the principles underlying article 2315, as applied to physicians in *Pitre,* convinces us that the Civil Code permits the articulation of a duty of care that would protect physical examinees, if they are to be deemed other than "patients," a position we do not here concede:

The persons at whose disposal society has placed the potent implements of technology owe a heavy moral obligation to use them carefully and to avoid foreseeable harm to present or future generations. In the field of medicine, as in that of manufacturing, the need for compensation of innocent victims of defective products and negligently delivered services is a powerful factor influencing tort law. Typically in these areas also the defendants' capacity to bear and distribute the losses is far superior to that of consumers. Additionally these defendants are in a much better position than the victims to analyze the risks involved in the defendants' activities and to either take precautions to avoid them or to insure against them. Consequently, a much stronger and more effective incentive to prevent the occurrence of future harm will be created by placing the burden of foreseeable losses on the defendants than upon the disorganized, uninformed victims.

*Pitre,* 530 So.2d at 1157.

From this linchpin the *Pitre* court held that when a physician knows or should know that there is an unreasonable risk that a child will be born with a foreseeable birth defect, he owes a duty, not only to that child's parents, *but to the not as yet conceived child,* to exercise reasonable care to warn the potential parents and assist them to avoid conception of the foreseeably deformed child. *Pitre,* 530 So.2d at 1157. If article 2315 supports such a duty we cannot but conclude that it also supports a duty between an examining physician and the person present and consenting to the examination, notwithstanding the claim that the examination is being conducted ostensibly for the benefit of another.

We live in an age in which the drive for an increasingly productive workforce has led employers increasingly to require that employees subject their bodies (and minds) to inspection in order to obtain or maintain employment. *See* Rothstein, *Employee Selection Based on Susceptibility to Occupational Illness,* 81 Mich.L.Rev. 1379 (1983) (common procedures include blood tests, urinalysis, pulmonary function tests, and x-rays).[2] In placing oneself in the

---

**2.** In 1982 the Office of Technology Assessment conducted an anonymous survey of the "For-

hands of a person held out to the world as skilled in a medical profession, albeit at the request of one's employer, one justifiably has the reasonable expectation that the expert will warn of "any incidental dangers of which he is cognizant due to his peculiar knowledge of his specialization." *American Mfrs. Mut. Ins. Co. v. United Gas Corp.*, 159 So.2d 592, 595 (La.App.1964).

We therefore now hold that when an individual is required, as a condition of future or continued employment, to submit to a medical examination, that examination creates a relationship between the examining physician and the examinee, at least to the extent of the tests conducted. This relationship imposes upon the examining physician a duty to conduct the requested tests and diagnose the results thereof, exercising the level of care consistent with the doctor's professional training and expertise, and to take reasonable steps to make information available timely to the examinee of any findings that pose an imminent danger to the examinee's physical or mental well-being. To impose a duty upon the doctor who performs such tests to do so in accordance with the degree of care expected of his/her profession for the benefit of the employee-examinee, as well as the employer, is fully consistent with the very essence of Civil Code article 2315.

The decision of the district court is REVERSED and the matter is REMANDED for further proceedings consistent herewith.

tune 500" companies, 50 largest private utilities, and 11 major labor unions. Of the 366 that responded, 6 organizations required their employees to submit to biochemical or cytogenetic tests, 17 had used such tests in the past 12 years, and 59 anticipated using such tests in the next 5 years. Most prevalent was testing for sickle cell, G–6–PD, alpha-antirypsin deficiency, un-

specified immune system markers, and chromosomal aberrations. *Occupational Illness*, 81 Mich.L.Rev. at 1414. The subsequent spread of drug testing in the workplace, coupled with the increasing awareness of the spread of the scourge of AIDS, makes the fusing of physical examination with the opportunity for employment even more likely.